536 A.2d 147

WALTER J. SCHLOSS ASSOCIATES, et al.

v.

The CHESAPEAKE AND OHIO RAILWAY
COMPANY, et al.

No. 710, Sept. Term, 1987.

Court of Special Appeals of Maryland.

Jan. 20, 1988.

Stephen Lowey (James M. Gallagher, Lowey, Dannenberg & Knapp, P.C., New York City, William C. Sammons, John B. Isbister, Tydings & Rosenberg, Baltimore, Robert M. Roseman, Rudolph, Seidner, Goldstein, Rochestie & Salmon, P.C., Eugene A. Spector & Associates, Philadelphia, Pa., Bertram Bronzaft, Garwin, Bronzaft, Gerstein & Fisher, New York City and David B. Zlotnick, Bala Cynwyd, Pa., on the brief), for appellants.

Wilbur D. Preston, Jr. (Richard J. Magid, William F. Ryan, Jr. and Whiteford, Taylor & Preston, on the brief), Baltimore (Alan A. Rudnick, Richmond, Va., and Robert Hochwarth, Baltimore, of counsel), for appellees.

Argued before WILNER, WEANT and KARWACKI, JJ.

WILNER, Judge.

One hundred sixty years and two months after its creation by the Maryland Legislature, the Baltimore and Ohio Railroad Company (B & O) went out of existence. It was merged into the Chesapeake and Ohio Railway Company (C & O) which, for many years, had had a controlling interest in B & O. Appellants are former minority stockholders of

B & O. Convinced that they were ill treated by B & O, C & O, and C & O's parent company, CSX Corporation, they brought this action in the Circuit Court for Baltimore City to enjoin the merger. Denied that relief, they sought to recover substantial damages in excess of the fair value of their stock. The denial of *that* relief is what sparked this appeal.

## Background

At all times relevant to this action, CSX owned all of the outstanding shares of C & O; C & O, in turn, owned at least 95% of the outstanding common stock and 99% of the outstanding preferred stock of B & O. Through these subsidiaries and through its own operations, CSX had a number of business lines. In December, 1985, it announced a realignment of them into four major groupings—transportation, energy, properties, and technology. The merger of B & O and C & O was part of that restructuring. According to the Information Statement published by B & O in connection with the merger:

"The restructuring of the railroad companies is designed to streamline the overall operations of CSX Transportation and to enable each of the railroads to operate more efficiently by combining them into a single entity, thereby profiting from the synergistic effects of operating one company as opposed to separate entities. The Merger of the B & O into the C & O is one step in this overall process to consolidate the rail companies into one efficient operating company.

The Merger of the B & O into the C & O will remove the administrative burdens of maintaining separate corporate entities, including keeping separate records, when the B & O operationally is already an integral part of CSX Transportation. By maintaining separate corporate entities, each company is required to keep a separate set of books and records. This activity is economically unproductive and the maintenance of separate entities creates a potential conflict of interest in all intercompany transactions because of the existence of minority share-

holders in some but not all of the related entities. B & O must structure transactions between it and its affiliates as 'arms' length transactions' which in turn require substantial administrative effort and expense. The requirements of separate entities diverts management's attention from more productive and substantive efforts. It is increasingly uneconomical to maintain this system of doing business."

Because C & O owned more than 90% of the outstanding common stock of B & O, it was able to proceed with the merger pursuant to Md. Code Ann.Corp. & Ass'ns art., § 3–106, which permits a merger to be achieved, under that circumstance, upon a resolution of the respective boards of directors without the need for stockholder approval. The rights of minority stockholders in such a merger are set forth in § 3–106(d), as follows:

"*Rights of minority stockholder.*—(1) Unless waived by all minority stockholders, at least 30 days before the articles are filed with the Department, a parent corporation which owns less than all of the outstanding stock of the subsidiary shall give notice of the transaction to each of the subsidiary's minority stockholders of record on the date of giving of the notice or on a record date fixed for that purpose which is not more than 10 days before the date of giving notice.

(2) A minority stockholder of the subsidiary has the right to demand and receive payment of the fair value of his stock as provided in Subtitle 2 of this title relating to objecting stockholders."

Subtitle 2, referred to in § 3–106(d)(2), comprises §§ 3–201—3–213. With exceptions not relevant here, § 3–202(a) confirms the right of a stockholder of a merging corporation "to demand and receive payment of the fair value of the stockholder's stock from the successor...." In a merger under § 3–106, fair value is to be determined as of the close of business on the day the notice provided for in § 3–106(d)(1) is given or waived. Subsequent sections in subtitle 2 set forth certain conditions to, procedures for, and

consequences of demanding and obtaining payment of fair value. Essentially, if an agreement as to fair value cannot be reached, the Circuit Court, upon petition by the objecting stockholder, appoints three disinterested appraisers to determine fair value. The appraisers' report is subject to confirmation by the court. Ultimately, whether the court confirms the report or rejects it and determines fair value itself, a judgment for the fair value is entered in favor of the stockholder.

In anticipation of the merger and in recognition of the fact that the merger would not be an arms-length transaction, B & O employed Morgan Stanley & Co. as a financial advisor to provide its opinion of the fair value of B & O's common stock. Morgan Stanley, a national investment banking firm, was no stranger to the CSX family. It had provided a variety of financial services to CSX and had underwritten several CSX offerings; it maintained a trading position in CSX stock, held options in CSX stock, and also, allegedly, had purchased in the open market B & O convertible debentures that would be called, and thus forcibly converted, as part of the B & O/C & O merger. Morgan Stanley's relationship with CSX was fully disclosed to the minority stockholders of B & O in the B & O Information Statement.

On December 1, 1986, Morgan Stanley rendered an opinion to the Board of Directors of B & O on the fair value, as of October 31, 1986, of the common shares of B & O "from the standpoint of the minority shareholders in connection with [the proposed merger]." On advice of counsel, it took as the standard of fair value "the economic value of the common stock of B & O assuming that the shares of stock were broadly held and freely-traded in the financial marketplace." [1] In preparing its opinion, Morgan Stanley said that it had reviewed the financial and operating record of B & O, including "projected income statements for 1986 and 1987" supplied by B & O, and that it had "discussed the business

---

1. B & O common stock was traded on the over-the-counter market.

and prospects of B & O with members of its management. . . . " It did not seek to verify public information or information supplied by B & O. Its conclusion was that the fair value of the B & O common stock as of October 31, 1986, was $300 million, or approximately $113/share.

The next day, December 2, the directors of B & O and C & O gave preliminary approval to the proposed merger by adopting a plan of merger. The plan called for the merger to become effective 30 days or more after notice of the proposal was mailed to the B & O stockholders, and provided for payment to the minority common stockholders of B & O of $113 per share.

That action prompted three groups of minority B & O stockholders to file separate actions in the Circuit Court for Baltimore City. On March 6, 1987, the court consolidated the three cases. Pursuant to that consolidation, the various plaintiffs promptly filed a Consolidated Amended Complaint.

The Consolidated Amended Complaint purported to be a class action by all minority stockholders of B & O. Its "substantive allegations" concerned three separate transactions: (1) the transfer by B & O of all of its non-rail assets to a CSX affiliate in December, 1977 (¶¶ 18–23); (2) the sale by B & O of its controlling interest in the Western Maryland Railway Company to C & O in February, 1983 (¶¶ 24–28); and (3) the proposed merger (¶¶ 29–50). At a hearing on the defendants' motions to dismiss that complaint, the plaintiffs conceded that the issues arising from the first two transactions had been resolved in other judicial proceedings and were no longer being pressed in this action. The focus, then, was solely on the proposed merger.

In that regard, the plaintiffs began with a general, non-specific complaint that the defendants had contrived to "siphon off B & O's earnings to defendants C & O and CSX, thereby artificially depressing B & O's earnings at the expense of B & O's minority shareholders. . . . " They averred that, since 1979, the defendants had caused B & O

to pay annual dividends of $8/share, thereby "upstreaming B & O's assets for the principal benefit of C & O" (¶ 30), although no claim was made that those dividends were in any way improper or that the minority stockholders did not share pro rata in them. They next contended that, in 1985, the defendants caused B & O to take a special $178 million charge against earnings "to reduce B & O's assets to their realizable value," resulting in a $21/share loss (¶ 31). Once again, there was no averment that there was any impropriety in that charge.

The balance of the complaint attacked the $113 price set by the B & O directors, the Morgan Stanley opinion, and the purpose for the merger. As to the price itself, the plaintiffs alleged that, according to B & O's 1985 annual report, shareholder equity was $939 million, or $340/share (¶ 32), that B & O's asset value increased by $355 million between 1983 and 1985 (¶ 33), and that the $113 was "grossly inadequate" (¶ 45).[2] Their attack on the Morgan Stanley opinion was based on allegations that B & O had provided to that firm "projected income statements for 1986 and 1987" that had not been provided to the minority stockholders (¶ 37), that neither the Morgan Stanley letter nor releases from CSX and its affiliate revealed the business relationship between Morgan Stanley and CSX (¶ 38) and (¶ 39) that:

"The Morgan Stanley 'fairness opinion' was not rendered in accordance with acceptable valuation standards applied from the point of view of B & O's minority stockholders, whose interests Morgan Stanley had purportedly undertaken to represent. Defendants have fraudulently and misleadingly failed to disclose that $113 per share was in the lower end of the range of fairness which Morgan Stanley arrived at. Morgan Stanley had a duty to negoti-

---

**2.** They also complained that the $113 price did not take into account the value to B & O of the derivative action litigation in Ohio challenging B & O's sale of Western Maryland Railway stock to C & O (¶¶ 40, 41). As noted, that case was ultimately resolved in favor of B & O and the plaintiffs decided not to press that claim further.

ate and defendants had a duty, as fiduciaries, to pay a per share price at the high end of the range of fairness."

Finally, plaintiffs charged generally that "[t]here is no proper business purpose for the proposed Merger" (¶ 44) and that C & O and CSX, as controlling shareholders of B & O, had a fiduciary duty to the plaintiffs which they violated "by engaging in unfair dealing, coercion, deception, manipulation and gross and palpable overreaching tantamount to fraud."

Upon these allegations, plaintiffs sought (1) a declaration that the defendants had violated their fiduciary duties to the plaintiffs, (2) an injunction against the merger, (3) an injunction against the mailing of notice of the proposed merger, (4) a revocation of the merger if it was consummated, (5) an accounting of the profits realized by the defendants from their wrongful conduct, (6) damages, and (7) attorneys fees.

Undeterred by this lawsuit, B & O and C & O proceeded with their planned merger. At some point, not clear in the record before us, B & O asked Morgan Stanley to review and update its December 1 opinion as to fair value. The firm did so and, on March 10, 1987, informed the B & O directors that the fair value of the B & O common stock as of March 9, 1987 was $330 million, or $123.71/share for the minority shares. Based in part on that revised opinion and in part on their own analysis, the directors, on March 10, formally approved the plan of merger and the payment of $124/share for the minority shares of B & O.

Ten days later, the plaintiffs moved to enjoin B & O from mailing a notice of the merger and an accompanying information statement until the court could rule on their request for class certification. The principal bases of the motion were that it would be premature for B & O to communicate *ex parte* with the minority stockholders until their status as a class could be determined and that any communication regarding the merger would be incomplete and misleading in that it could not include the court's decisions (not yet

made) on class certification and on anticipated motions to dismiss the complaint. The plaintiffs were particularly concerned that the notice would inform the minority stockholders that they had only the appraisal rights provided by § 3–106(d)(2) and §§ 3–201—3–213 and that they would have to elect to pursue those rights within 30 days. After a hearing on March 24, 1987, the court denied the motion, finding that the proposed notice and information statement fairly summarized the pending litigation and were neither premature nor incomplete or misleading.

On March 26, the defendants moved to dismiss the complaint on the grounds that (1) the plaintiffs' exclusive remedy was the statutory appraisal rights provided in the Maryland Code, (2) injunctive relief was inappropriate because the plaintiffs had an adequate remedy at law, and (3) CSX in particular had no duty to the plaintiffs. The next day, March 27, the notice required under § 3–106(d)(1) was sent by B & O; the merger itself became effective April 30, 1987.

Defendants' motion to dismiss was heard on April 13. After plaintiffs' counsel virtually conceded that the case was one for money damages, the court determined that injunctive relief against the merger was inappropriate. It found plaintiffs' allegations of fraud to be entirely too general and thus concluded that the dispute was essentially over the value of the stock, which could be resolved through the statutory appraisal process. At plaintiffs' request, however, the court gave counsel *10* days in which to file a motion for leave to file a second amended complaint. A formal order embodying the court's findings was filed the next day.

*Thirteen* days later, plaintiffs filed a motion for leave to amend their complaint. Attached to the motion was a second amended complaint that they proposed to file. The proposed complaint dropped B & O as a defendant, retained C & O and CSX, and added Morgan Stanley. It omitted any reference to the earlier transactions complained of, i.e., the sale by B & O of its non-rail assets and its interest in

Western Maryland Railway and focused entirely on the merger. The "substantive allegations" with respect to B & O, C & O, and CSX, with some updating, were similar to those in the first consolidated complaint. The plaintiffs sought to complain about the $8/share dividends, the special $178 million charge, the difference between the stockholder equity shown on the latest annual report and the $113/share price initially approved by the B & O directors, and the additional assets generated by B & O between 1983 and 1986.

The principal expansion in the new complaint concerned Morgan Stanley and its opinion letters. Plaintiffs charged that the information statement sent by B & O with the notice of merger was fraudulent because (1) it asserted that Morgan Stanley was "independent" when in fact the firm was not "independent," (2) it asserted that Morgan Stanley's opinion of fair value was from the standpoint of the minority stockholders when in fact it was not, (3) it failed to disclose that, though Morgan Stanley was asked to render an opinion as to fair value "from a financial point of view," Morgan Stanley did not do so, and (4) it failed to disclose that Morgan Stanley was instructed by the B & O board not to take book or liquidation value into account.

The new complaint ended with general averments that the $124/share price "is so grossly inadequate as to constitute ... a fraud on B & O's minority stockholders," that C & O, as controlling shareholder of B & O, had breached fiduciary duties owed to the minority stockholders of B & O, and that CSX and Morgan Stanley "aided and abetted" C & O in the breach of its fiduciary duties.

On May 13, 1987, the court denied leave to file the second amended complaint, thereby terminating plaintiffs' ability to proceed further in the Circuit Court. In this appeal, filed the next day, plaintiffs make two arguments:

Statutory appraisal rights do not preclude maintenance of an action by minority stockholders against the majority stockholder and others for unfair deal-

ing and overreaching in connection with a short-form cash-out merger.

■ Appellants have adequately alleged facts which, if proved, entitle them to appropriate relief under Maryland law."

At oral argument, plaintiffs abandoned any reliance on the Consolidated Amended Complaint and asked that we focus exclusively on the Consolidated Second Amended Complaint. The issue, then, is whether, on the facts pled in that complaint, the plaintiffs are entitled to any relief beyond payment of the fair value of their stock, provided for in § 3-106(d)(2) and determined in accordance with §§ 3-201—3-213.

### Legal Analysis

Fletcher Cyclopedia Corporations, § 5906.1 provides a good introduction to the issue before us:

"At common law, unanimous consent of the stockholders was necessary to warrant certain corporate acts, such as consolidation or merger, transfer of all the corporate assets, and any fundamental charter amendment. These restrictions on the majority were serious impediments to the sweeping reorganizations in structure which modern needs had made the order of the day. Consequently statutes were passed in most states conferring wide powers on the majority or a specified percent of the stock, to amend the charter, sell, consolidate, merge, etc. In enacting such statutes, however, it was realized that it was necessary to afford some relief to dissenters, with the result that in most jurisdictions statutes were enacted which give the dissenters the right to receive the cash value of their stock and provide for an appraisal where no agreement as to value can be reached. The dissenter's appraisal remedy is entirely the product of statute."

(Footnotes omitted.) See also *Voeller v. Neilston Co.*, 311 U.S. 531, 535 n. 6, 61 S.Ct. 376, 377–78 n. 6, 85 L.Ed. 322 (1941); Thompson, *Squeeze–Out Mergers and the "New" Appraisal Remedy*, 62 Wash.U.L.Q. 415, 416–18 (1984).

Sections 3–105 and 3–106 of the Corp. & Ass'ns art. represent two types of statutes allowing a majority of the ownership interest, in effect, to oust a minority interest against its will. Section 3–106 is, of course, the more extreme provision; because one stockholder, the parent, has such a thoroughly controlling interest in the subsidiary corporation, acquiescence by the subsidiary in the merger between parent and subsidiary is always assured. That is why the formality of stockholder approval is dispensed with; it is also why mergers under such statutes are commonly referred to as "freeze-out," "squeeze-out," or "cash-out" mergers.

As we observed, § 3–106(d)(2) gives an objecting minority stockholder in such a merger the right to receive the fair value of his, her, or its stock in accordance with the provisions of §§ 3–201—3–213. Unlike similar statutes in a few other States, there is nothing in § 3–106(d) to indicate whether the Legislature intended for that remedy to be exclusive or non-exclusive; it is simply afforded. Defendants argue that the "payment of fair value" remedy in § 3–106 mergers is, or should be, exclusive. Plaintiffs, of course, have a different view. Relying principally on *Twenty Seven Trust v. Realty Growth Investors*, 533 F.Supp. 1028 (D.Md.1982), and *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del.1983), they contend that, at least where allegations of fraud, breach of fiduciary obligation, overreaching, or lack of fair dealing are made (and ultimately proved), they are not limited to the payment of fair value, even after the merger is consummated, but may, in the alternative, sue for rescissory or other damages.

■ On this rather general question, we agree with the plaintiffs. Even in States having statutes purporting to make the "payment of fair value" an exclusive remedy, the courts have allowed at least injunctive relief under special, compelling circumstances. See, for example, Pa.Stat.Ann., title 15, § 1515 K (dissenting shareholders "shall be limited to the rights and remedies prescribed under this section, and the rights and remedies prescribed by this section shall

be exclusive"), but compare *In re Jones & Laughlin Steel Corp.*, 412 A.2d 1099 (Pa.1980), and *Miller v. Steinbach*, 268 F.Supp. 255, 269–71 (S.D.N.Y.1967). See also J. Vorenberg, *Exclusiveness of the Dissenting Stockholder's Appraisal Right*, 77 Harv.L.Rev. 1189, 1207 (1964). In terms of Maryland law, we agree with Judge Miller's analysis in *Twenty Seven Trust, supra*, 533 F.Supp. at 1036, based on pronouncements in *Homer v. Crown Cork and Seal Co.*, 155 Md. 66, 141 A. 425 (1928), and *American General Corp. v. Camp*, 171 Md. 629, 190 A. 225 (1937), that "Nothing in the present appraisal statute ... or the act from which it is derived ... indicates that statutory appraisal was intended to be a dissenting shareholder's exclusive remedy in connection with mergers and consolidations under all circumstances. Indeed, *Homer* and *American General* suggest to the contrary."

That conclusion was confirmed in *Lerner v. Lerner*, 306 Md. 771, 511 A.2d 501 (1986), where the Court of Appeals upheld an interlocutory injunction restraining a majority stockholder from proceeding with a "freeze-out" of the minority shareholder through a reverse stock split. Although the case did not involve a merger, much less one under § 3–106, the Court's analysis and conclusion are relevant here. The minority shareholder would have had his "payment of fair value" rights under §§ 3–201—3–213 had the transaction been consummated, and, indeed, in attacking the injunction, the majority shareholder argued that that remedy was exclusive.

The Court rejected that argument, "for reasons having more to do with the law of preliminary injunctions than with the law of minority freezeouts." *Id.*, 772, 511 A.2d 501. In the matrix of considerations bearing on that issue—and in particular the comparability of harm element—the Court gave special attention to the facts that (1) the record was sparse in revealing any business purpose to the stock split other than simply freezing out the minority interest and (2) the minority stockholder could suffer irreparable harm if the value of his stock had to be determined prior to the

resolution of a separate derivative action which was then pending.

In its discussion, the *Lerner* Court cited *Homer* as standing, at least in part, for the proposition that "an injunction can lie where there is 'fraud,' despite the availability of an appraisal remedy." 306 Md. at 781, 511 A.2d 501.

It is evident, then, that the right to receive fair value and the availability of the statutory appraisal procedure is not exclusive, at least to the point of foreclosing injunctive relief, in freeze-out situations. Although none of these cases—*Homer, American General, Twenty Seven Trust,* or *Lerner*—involved a merger under § 3–106, we fail to see any basis for distinguishing that kind of merger from the more traditional type in this regard. To the extent that special, compelling circumstances may justify alternative relief in other freeze-out situations, those circumstances, if present in a merger under § 3–106, should justify equivalent relief. Indeed, because in a § 3–106 merger the minority is even more at the mercy of the majority, having no ability to thwart the action, there is even more reason for a court to act, where action is warranted.

This conclusion, that the right to receive fair value does not *necessarily* preclude other relief, is merely a starting point, however. The question, as we indicated, is whether the alternative relief now sought by the plaintiffs is available to them on the facts pled in this case.

In that regard, it is important to note that injunctive relief is no longer at issue. The plaintiffs lost that effort in the Circuit Court and have neither pursued it nor complained of the loss in this appeal. Although they included in their Consolidated Second Amended Complaint an alternative or contingent request that the B & O–C & O merger be set aside, they do not seem to press for that relief in the appeal but urge only that the defendants are "liable" to them for their (the defendants') allegedly wrongful acts. The relief they seek, it would seem, is in the form of money damages of some sort.

That has a critical significance, especially in light of the cases cited by plaintiffs to support their position. In nearly every case in which a court has allowed a dissenting minority stockholder to pursue relief other than payment of fair value, either the alternative relief allowed was to enjoin or upset the squeeze-out or such relief was unreasonable only because the defendants had successfully concealed the relevant facts until the challenged action had been consummated and could not practicably be set aside. Although we do not take that as necessarily establishing a *"per se"* rule that absolutely forecloses all forms of other alternative relief in *ex post facto* situations, it does at least require a degree of circumspection not apparently recognized by the plaintiffs.

In the successful injunction or rescission cases, the common complaint is that (1) the proposed action is being pursued solely to squeeze out a minority interest and has no other legitimate business purpose, and/or (2) the action itself is *ultra vires* for some reason, and/or (3) procedures required by law, charter, or by-law have not been followed, and/or (4) there has been some kind of fraud or extreme violation of fiduciary duties by the majority stockholder or the officers or directors of the corporation in the timing or structure of the proposed action that go beyond merely the price to be offered for the minority shares. It is when faced with substantial and specific averments (or proof) of this type that courts have found the right to payment of fair value inadequate and therefore non-exclusive. It is in this type of setting that courts have invoked their traditional and more general equity powers. See *Homer v. Crown Cork and Seal Co., supra,* 155 Md. 66, 141 A. 425; *Lerner v. Lerner, supra,* 306 Md. 771, 511 A.2d 501; *Twenty Seven Trust v. Realty Growth Investors, supra,* 533 F.Supp. 1028; *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983); *Rabkin v. Philip A. Hunt Chemical Corp.,* 498 A.2d 1099 (Del. 1985); *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.,* 532 A.2d 1324 (Del.Ch.1987), [1987 Transfer Binder], Fed.Sec.L.Rep. (CCH) ¶ 93,331 (Aug. 12, 1987); *Bryan v.*

*Brock & Blevins Co., Inc.,* 490 F.2d 563 (5th Cir.), *cert. denied* 419 U.S. 844, 95 S.Ct. 77, 42 L.Ed.2d 72 (1974); *Berkowitz v. Power/Mate Corporation,* 135 N.J.Super. 36, 342 A.2d 566 (1975); *cf. In re Jones & Laughlin Steel Corp.,* 488 Pa. 524, 412 A.2d 1099 (1980); *Gabhart v. Gabhart,* 267 Ind. 370, 370 N.E.2d 345 (1977); compare *Walter J. Schloss Associates v. Arkwin, Ind.,* 61 N.Y.2d 700, 472 N.Y.S.2d 605, 460 N.E.2d 1090 (1984), adopting dissenting Opinion in 90 A.D.2d 149, 455 N.Y.S.2d 844, 847 (1982).

Even within this somewhat limited universe, many of the successful actions flowed from the doctrine presaged by Professor Vorenberg in his Harvard Law Review article (see *ante* ) and adopted by the Delaware Court in *Singer v. Magnavox Co.,* 380 A.2d 969, 980 (Del.1977), that a merger "made for the sole purpose of freezing out minority stockholders, is an abuse of the corporate process; and the complaint, which so alleges ... states a cause of action for violation of a fiduciary duty for which the Court may grant such relief as it deems appropriate under the circumstances." Acceptance of that doctrine necessarily called for a more liberal intervention by equity courts, for, especially in parent-subsidiary mergers, a squeeze-out of the minority interest is often the predominant, if not the only, real impetus behind the proposal.

In *Weinberger v. UOP, Inc., supra,* 457 A.2d 701, the Delaware Court that, to a large extent, introduced this doctrine into the case law, abandoned it as being "new to our law of mergers and ... a departure from prior case law." *Id.,* 715. No longer, in Delaware, would squeeze-out mergers be at risk solely because they had no independent business purpose. That decision, as well as a few other aspects of *Weinberger,* has produced another flurry of comment. See, for example, Steinberg and Lindahl, *The New Law of Squeeze-Out Mergers,* 62 Wash.U.L.Q. 351 (1984); Herzel and Colling, *Establishing Procedural Fairness in Squeeze-Out Mergers After Weinberger v. UOP,* 39 Bus.Law. 1525 (1984); Berger and Allingham, *A New Light*

*on Cash-Out Mergers: Weinberger Eclipses Singer,* 39 · Bus.Law. 1 (1983).

*Weinberger* involved a proposal by a 50.5% parent to purchase the remaining 49.5% of the shares of the subsidiary. Officials of the parent, who were also directors of the subsidiary, concluded in a written report that purchase of those shares at up to $24/share would be a good investment for the parent. The parent decided to offer only $21/share, however. There was no arms-length negotiation; a financial consultant rendered a hasty and clearly less-than-independent fairness opinion, put together virtually over a weekend, supporting the $21 price; the report indicating that $24/share would be a good investment was not shared with the "outside" directors of the subsidiary, the financial consultant, or the minority stockholders; the merger was approved by the two boards within one week from the day the parent decided to proceed with it; and the difference between $21/share and $24/share represented over $17 million to the minority shareholders. As the merger had been completed by the time the case got to court, the plaintiffs sought rescission or, in the alternative, rescissory damages. See *Weinberger v. UOP, Inc.,* 426 A.2d 1333 (Del.Ch.1981).

On those facts, the Delaware Supreme Court laid down these principles applicable to the issue at bar:

(1) in an action challenging a cash-out merger, the plaintiff "must allege specific acts of fraud, misrepresentation, or other items of misconduct to demonstrate the unfairness of the merger terms to the minority." 457 A.2d at 703.

(2) the person attacking the merger has the burden of demonstrating some basis for invoking the fairness obligation, and when the corporate action has been approved by an informed vote of a majority of the minority shareholders, he has the burden of showing that the transaction was unfair to the minority. *Id.*

(3) "The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces ques-

tions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock.... However, the test for fairness is not a bifurcated one as between fair dealing and price. All aspects of the issue must be examined as a whole since the question is one of entire fairness."

(Citations omitted.) *Id.*, 711.

(4) the remedy for minority stockholders in a cash-out merger "is, and hereafter should be, an appraisal under [the Delaware statute]," *id.*, 703. However:

"While a plaintiff's monetary remedy ordinarily should be confined to the more liberalized appraisal proceeding herein established,[3] we do not intend any limitation on the historic powers of the Chancellor to grant such other relief as the facts of a particular case may dictate. The appraisal remedy we approve may not be adequate in certain cases, particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved.... Under such circumstances, the Chancellor's powers are complete to fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages."

(Citations omitted.) *Id.*, 714.

Applying these principles, the Court reversed the chancellor's determination that the transaction was fair and remanded for further proceedings. On remand, the chancellor found rescissory damages to be inappropriate. Instead, "[b]ased upon the premise that the wrong to the UOP

---

**3.** See 457 A.2d 712–14.

minority was [the parent's] failure to disclose information necessary to an informed vote," the chancellor awarded compensatory damages of $1/share plus interest. See *Weinberger v. UOP, Inc.*, 517 A.2d 653 (Del.Ch.1986), summarizing *Weinberger v. UOP, Inc.*, Del.Ch.Civ.Act. 5642 (Jan. 30 1985). That decision was later affirmed by the Delaware Supreme Court. *Weinberger v. UOP, Inc.*, 497 A.2d 792 (Del.1985).

The Delaware Court returned to some of the principles laid down in *Weinberger* in *Rabkin v. Philip A. Hunt Chemical Corp.*, 498 A.2d 1099 (Del.1985). The parent there had acquired a 63.4% interest in the subsidiary, paying $25/share. As part of that transaction, it had agreed that, if it acquired the balance of the shares within one year, it would pay the equivalent of $25/share. Evidence showed that the parent always anticipated owning 100% of the subsidiary but that it deliberately waited until the end of the one-year period to proceed. Within a month after the end of the period, it proposed to pay $20/share and procured a "fairness" opinion that $20 was a fair price. The subsidiary's board appointed a special committee of its outside directors to review the proposal; the special committee employed its own financial consultant, which confirmed that $20 was fair. When the parent refused to increase the price, the special committee recommended approval.

The chancellor dismissed an action by the minority shareholders alleging inadequate price and an unfair manipulation of the timing of the merger, concluding that, absent claims of fraud or deception, the minority was limited to payment of fair value established by appraisal. Again, the Delaware Supreme Court reversed, viewing the minority's claim as not really involving what the stock was worth but rather the parent's breach of a fiduciary duty to pay at least $25/share, whatever the stock was worth. That is an issue, said the Court, "which an appraisal cannot address." *Id.*, 1106.

The full impact of *Weinberger's* several pronouncements, even on Delaware law, may not yet be entirely clear. Certainly, the Delaware Court has abandoned the independent business purpose requirement, which was in effect for only six years. Just as certainly, it has made the appraisal process a preferred remedy, limiting alternative remedies, based on unfairness, to cases where the plaintiff alleges (and ultimately próves) "specific acts of fraud, misrepresentation, or other items of [unfairness]." Indeed, in *Green v. Santa Fe Industries, Inc.,* 70 N.Y.2d 244, 519 N.Y.S.2d 793, 799, 514 N.E.2d 105, 111 (1987), the Court of Appeals of New York, applying Delaware law, took the view that,

> "As we read the post-*Weinberger* Delaware case law, in the event of a properly conducted cash-out merger ...— even one effected solely for the purpose of freezing out the minority stockholders—the minority has no claim beyond its statutory right to seek an appraisal of its shares absent a demonstration of 'fraud or blatant overreaching,'"

citing *Greene & Co. v. Schenley Indus.,* 281 A.2d 30 (Del. ch. 1971).

And also just as certainly, the Delaware Court has required "specific acts" to be pled and proved. In *Rabkin,* it made clear that conclusory fluff will not suffice. Compare *Sealy Mattress Co. of New Jersey, Inc. v. Sealy, Inc.,* 532 A.2d 1324 (Del.Ch.1987), [1987 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 93,331 (Aug. 12, 1987).

■ Although in *Lerner v. Lerner, supra,* 306 Md. 771, 511 A.2d 501, the Court of Appeals specifically refrained from deciding "whether to adopt the *Weinberger* rule," presumably meaning the abandonment of the "business purpose" requirement and adoption of an "entire fairness" standard, in this case it makes little difference whether or not the "business purpose" requirement exists.[4] If an

---

4. While the *Lerner* Court observed that "the majority of courts that have considered challenges to freezeouts seem to agree, at least at the

independent business purpose is *not* required, the absence of one will not, of itself, taint the transaction. If such a purpose *is* required, the record before us clearly shows the existence of one. The Information Statement sent to the B & O minority stockholders, part of which we quoted earlier in this Opinion, sets forth an objectively reasonable business purpose for the merger. Although plaintiffs make the bald charge that the merger had no independent business purpose, they do not even suggest, much less affirmatively charge, that the reasons set forth by B & O either do not exist or are merely pretextual.

■■■ As to whether, and under what circumstances, a monetary remedy apart from payment of fair value and the statutory appraisal process is available, there does not seem to be a great deal of difference between established Maryland law and the principles enunciated in *Weinberger* and *Rabkin*. Such a remedy is available, if at all, under very limited circumstances, none of which are well-pled or in evidence here.

Putting aside the general conclusory averments of wrongdoing, the plaintiffs' articulated complaints fall into three categories: (1) that in years past, the B & O directors declared $8 annual dividends and, on one occasion, made an extraordinary charge against earnings; (2) that the $124 offered for the minority shares was inadequate; (3) that there were some deficiencies in the Morgan Stanley fairness opinions and the manner in which they were developed that either rendered the opinions suspect or that were not disclosed to the minority stockholders.

conceptual level of legal principle, that the majority may freeze out the minority if there is a business purpose of the action" (*306 Md.* at 781, 511 A.2d 501), neither *Lerner* nor any other Maryland case of which we are aware has actually held that a freeze-out merger must have an independent business purpose beyond ouster of the minority to survive judicial scrutiny. As Professor Vorenberg observed in his article (see *ante*), however, to some extent this may be a matter of definitional vagueness. Is the merger really a "freeze-out" merger if it has some independent purpose? See 77 Harv.L.Rev. at 1192–93.

As we earlier observed, plaintiffs have failed to allege any particular impropriety in the $8 dividends or special charge against earnings. The simple answer to those complaints, as pled, is "so what"?

With respect to the third category, plaintiffs complain that, because of its dealings with CSX or because of the fee paid to it by B & O, Morgan Stanley was not really independent as claimed in the Information Statement, that B & O instructed Morgan Stanley not to take into account book or liquidation value but fraudulently concealed that instruction in the Information Statement, that Morgan Stanley acted in part on the advice of its counsel, and that its opinion was not rendered "from the standpoint of the minority stockholders." Those averments too are wholly inadequate. Some are merely conclusory, without any factual support. That Morgan Stanley acted, in part, on advice of counsel is hardly ground for censure. Insofar as the firm's independence is concerned, there is again a lack of any detailed averment that the fee paid for its work or its involvement with CSX securities adversely affected its exercise of independent judgment in this case. Compare *Weinberger v. UOP, supra,* 457 A.2d 701.

What we have then is essentially a complaint over price—the amount and how it was established—for which the statutory appraisal right is a wholly adequate remedy. See *Walk v. Baltimore and Ohio R.R.,* 659 F.Supp. 824 (D.Md. 1987). There has been a full disclosure by B & O of the purpose and terms of the merger and how the price offered was determined. There is no suggestion of a manipulated timing or any illegal or *ultra vires* acts on the part of B & O, C & O, CSX, or Morgan Stanley. As the *Rabkin* Court observed, 498 A.2d at 1107–08: "A balance must be struck between sustaining complaints averring faithless acts, which taken as true would constitute breaches of fiduciary duties that are reasonably related to and have a substantial impact upon the price offered, and properly dismissing those allegations questioning judgmental factors of valuation."

We believe the plaintiffs' complaints fall into the latter category. We therefore find no abuse of discretion in the court's refusal to permit the Consolidated Second Amended Complaint. Had the complaint been filed, the court would have been obliged to dismiss it.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.