875 F.2d 549
 PITTSBURGH TERMINAL CORPORATION, a Pennsylvania Corporation,
derivatively for the Defendant The Baltimore and
Ohio Railroad, a Maryland Corporation,
Plaintiff-Appellant,
v.
BALTIMORE AND OHIO RAILROAD; Chesapeake and Ohio Railway;
CSX Corporation; John T. Collinson; Alvin R. Carpenter;
Roland W. Donnem; Paul A. Funkhouser; Paul R. Goodwin;
Norman G. Halpern; Robert L. Hintz; John S. Lanahan;
Kenneth C. Morriss; Richard G. Rayburn; Richard D.
Sanborn; John W. Snow; Hays T. Watkins; Defendants-Appellees.
 No. 87-3678.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 16, 1989.
Decided May 19, 1989.
 
 Michael P. Malakoff, Ellen M. Doyle, Joseph F. McDonough (argued), Manion, McDonough & Lucas, Pittsburgh, Pa., Virginia L. Reichard, Gallagher Sharp Fulton & Norman, Cleveland, Ohio, for plaintiff-appellant.
 Eben G. Crawford (argued), Squire, Sanders & Dempsey, Frances Floriano Goins, Robert F. Hochwarth, General Counsel, Chessie System Railroads, Cleveland, Ohio, for defendants-appellees.
 Before: KEITH, MARTIN and RYAN, Circuit Judges.
 BOYCE F. MARTIN, JR., Circuit Judge.
 
 
 1
 The Pittsburgh Terminal Corporation, a minority shareholder of the Baltimore & Ohio Railroad, brought this derivative action on behalf of Baltimore & Ohio, a Maryland corporation, against defendants Baltimore & Ohio, Chesapeake & Ohio Railway, CSX Corporation, and individual officers and directors of Baltimore & Ohio and Chesapeake & Ohio, alleging a breach of fiduciary duty in Baltimore & Ohio's sale in 1983 of its stock in the Western Maryland Railway Company to Chesapeake & Ohio for a price that was too low. Following a trial before the district court, judgment was entered in favor of all defendants, and Pittsburgh Terminal's motion for injunctive relief was denied. We affirm the decision of the district court.
 
 I.
 
 2
 With the centralization of and the decline in usage of rail transportation, Baltimore & Ohio, Chesapeake & Ohio and Western Maryland, along with various affiliated rail companies and subsidiaries, were amalgamated into the Chessie System Railroads. The CSX Corporation was formed to acquire the shares of these railroads that comprise the Chessie System, as well as other railroads in the eastern United States. Prior to the challenged sale of Western Maryland stock in 1983, CSX owned 100% of Chesapeake & Ohio, which owned 98% of the common stock of Baltimore & Ohio; the remainder of Baltimore & Ohio's common stock was held by minority shareholders, including Pittsburgh Terminal. Baltimore & Ohio, in turn, owned approximately 66% of the stock of Western Maryland, with Chesapeake & Ohio owning an additional 20% of Western Maryland's stock. CSX, through its control of Chesapeake & Ohio, therefore controlled Baltimore & Ohio and Western Maryland at all times that are relevant. Moreover, the directors of Baltimore & Ohio were also directors of Chesapeake & Ohio and Western Maryland.
 
 
 3
 In January 1983, the First Boston Corporation prepared a study entitled "Materials for Discussion CSX Corporation," which compiled financial data for Western Maryland and compared other railroads with Western Maryland. Using the data gathered for this study, Paul Goodwin, senior vice president of finance for both Baltimore & Ohio and Chesapeake & Ohio, and his staff formulated an offering price for Western Maryland's stock of $55 per share.
 
 
 4
 Chessie, allegedly as part of a corporate simplification plan, then proposed a merger of Western Maryland and the Peakbay Corporation, another wholly-owned subsidiary of Chesapeake & Ohio. Under the merger plan, each share of Western Maryland common stock would be converted into the right to receive $55 cash or CSX common stock of substantially equivalent value. The Board of Directors of Chesapeake & Ohio approved the Western Maryland/Peakbay merger on February 8, 1983. On that same day, Baltimore & Ohio's Board of Directors, following a brief meeting, also resolved to vote in favor of the merger and elected to receive cash for its Western Maryland stock. Except for the limited involvement of First Boston, the Boards of Baltimore & Ohio and Chesapeake & Ohio approved the proposed merger without any independent examination of the merger by disinterested lawyers, accountants or financial advisors.
 
 
 5
 On March 18, 1983, Western Maryland issued a proxy statement concerning the merger. The proxy statement, which was sent to Baltimore & Ohio, Chesapeake & Ohio and all other shareholders of Western Maryland, included a letter from First Boston stating that the proposed price of $55 per share was fair to Western Maryland's shareholders other than Chesapeake & Ohio. The price of $55 per share was below the book value of $63.43 per share, but was considerably higher than the market price of the Western Maryland stock, which was traded in the over-the-counter market at a stipulated price of $31.50 per share on February 7, 1983.[1]
 
 
 6
 The shareholders of Western Maryland approved the Peakbay merger on April 14, 1983. Baltimore & Ohio received $64,204,690 from Chesapeake & Ohio for the Western Maryland stock, which had a cost of $18,000,000.
 
 II.
 
 7
 Pittsburgh Terminal filed its complaint on April 13, 1984, alleging that Baltimore & Ohio's sale of its majority interest in Western Maryland to Peakbay, a wholly-owned subsidiary of Chesapeake & Ohio, was for the benefit of Chesapeake & Ohio and CSX, not for the benefit of Baltimore & Ohio. In addition, Pittsburgh Terminal alleged that the consideration paid by Chesapeake & Ohio to Baltimore & Ohio was inadequate and substantially less than Baltimore & Ohio would have received had it solicited bids for its controlling interest in Western Maryland from outside parties; more specifically, Pittsburgh Terminal claimed that Baltimore & Ohio received no premium from Chesapeake & Ohio for the sale of the majority interest in Western Maryland. Thus, Pittsburgh Terminal alleged that the defendants breached their fiduciary duty to Baltimore & Ohio and its minority shareholders by using their control over Baltimore & Ohio to compel it to engage in a disadvantageous financial transaction. For relief, Pittsburgh Terminal requested recision of the Western Maryland/Peakbay merger, recision of the sale of Baltimore & Ohio's stock in Western Maryland to Chesapeake & Ohio, and recisionary damages.
 
 
 8
 This case was tried in September 1986. Shortly thereafter, Baltimore & Ohio and Chesapeake & Ohio agreed to merge. On March 31, 1987, the district court entered judgment in favor of defendants, 662 F.Supp. 430 (N.D.Ohio 1987). On April 1, 1987, Pittsburgh Terminal filed a motion for injunctive relief to maintain the status quo and to restrain defendants from engaging in a merger without preserving Pittsburgh Terminal's derivative claims. On April 30, 1987, the district court filed its findings of fact and conclusions of law, and, on the same day, Baltimore & Ohio merged into Chesapeake & Ohio so that Baltimore & Ohio ceased to exist. The district court subsequently overruled Pittsburgh Terminal's motion for injunctive relief. Following Pittsburgh Terminal's appeal to this court, the defendants filed a motion to dismiss the appeal on the ground that Pittsburgh Terminal lacked standing to pursue its derivative action because Pittsburgh Terminal was no longer a shareholder of Baltimore & Ohio after Baltimore & Ohio merged into Chesapeake & Ohio.
 
 
 9
 In its findings of fact and conclusions of law, the district court, applying the Maryland statute that governs transactions between corporations with interlocking directorships, held that defendants did not breach their fiduciary duties to Baltimore & Ohio because defendants had met their burden of proving Baltimore & Ohio's sale of its Western Maryland stock for $55 per share to be fair and reasonable to Baltimore & Ohio. The district court did state that "the defendants' method of proceedings and attention to detail left a lot to be desired"; specifically, the court noted that the defendants relied too heavily on Goodwin's valuation of the Western Maryland stock and that a disinterested third party should have been involved in the transaction to ensure the protection of minority interests. The district court concluded, however, that the "substance, if not the form, of the transaction was fair and reasonable" because the price of $55 per share was fair and reasonable. The district court also concluded, contrary to the specific assertions of Pittsburgh Terminal, that:
 
 
 10
 (1) there had been an adequate analysis of information upon which to determine the fair market value of the Western Maryland stock;
 
 
 11
 (2) the railroads compared to Western Maryland when valuing the stock were in fact comparable;
 
 
 12
 (3) consideration was given to minority interests in determining fair market value of the Western Maryland stock;
 
 
 13
 (4) it was not necessary for Chesapeake & Ohio to pay a premium to Baltimore & Ohio for Baltimore & Ohio's sale of its stock in Western Maryland; and
 
 
 14
 (5) the price/earnings ratio for a five-year period, which was the method used by defendants to determine the fair market value of the Western Maryland stock, was a more appropriate method of valuation than the methods, such as asset value or book value of the stock, suggested by Pittsburgh Terminal.
 
 III.
 
 15
 On appeal, the parties agree that the law of Maryland, Baltimore & Ohio's state of incorporation, governs the resolution of this case. Based upon our interpretation of the applicable Maryland law and our review of the findings of the district court, we conclude that the district court did not err in granting judgment for the defendants.
 
 
 16
 In its appeal, Pittsburgh Terminal initially contended that the individual defendants failed to exercise due care, as required by Maryland law, in their approval of Baltimore & Ohio's sale of its Western Maryland stock for $55 per share. Maryland law requires a director to perform his duties in a manner he reasonably believes to be in the best interests of the corporation and with the care that an ordinarily prudent person in a like position would use under similar circumstances. Md.Ann.Code Corporations and Associations Sec. 2-405.1(a). According to Pittsburgh Terminal, the defendant Baltimore & Ohio directors did not exercise due care because they failed to review or to even understand the valuation of the Western Maryland stock. Smith v. Van Gorkom, 488 A.2d 858, 874 (Del.Supr.1985); Edelman v. Fruehauf Corp., 798 F.2d 882, 886 (6th Cir.1986); Hanson Trust PLC v. MLSCM Acquisition, Inc., 781 F.2d 264, 274-76 (2d Cir.1986).
 
 
 17
 We disagree with Pittsburgh Terminal's argument. Section 2-405.1 does, as Pittsburgh Terminal asserted, establish the general standard of care that corporate directors must meet in performing their duties. Pittsburgh Terminal failed, however, to address Sec. 2-419, which specifically governs transactions between corporations with common directors. Under Sec. 2-419, a transaction between corporations with common directors is not void or voidable solely on account of the existence of common directors if the transaction was "fair and reasonable." The burden of proving the transaction to be fair and reasonable rests on the party asserting the validity of the challenged transaction. We believe that the district court correctly applied Sec. 2-419 to the facts of this case by shifting the burden to the defendants to prove that the sale of the Western Maryland stock was fair and reasonable to Baltimore & Ohio. The district court found the sale of the Western Maryland stock to be fair and reasonable and consequently entered judgment in favor of defendants. To reject the district court's finding that the transaction was fair and reasonable, Pittsburgh Terminal must establish the finding to be clearly erroneous. As stated in United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), a finding is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." See also Archer v. Macomb County Bank, 853 F.2d 497, 499 (6th Cir.1988).
 
 
 18
 Pittsburgh Terminal attempted to establish that Baltimore & Ohio's sale of its Western Maryland stock was not fair and reasonable by challenging both the offering price of $55 per share and the defendants' valuation procedures. More specifically, Pittsburgh Terminal contended that the district court erred in accepting the defendants' inappropriate method of valuing the Western Maryland stock and in deferring to the valuation of the stock prepared by Goodwin, one of the common directors. We do not agree with Pittsburgh Terminal's contention. The district court did not blindly defer to the defendants' valuation of the Western Maryland stock, but specifically found that there had been an adequate analysis of information upon which to determine the value of the stock and that the historical price/earnings ratio, which was used by defendants to value the stock, was a more appropriate method of determining value than other methods suggested by Pittsburgh Terminal. These factual findings concerning valuation will not be disturbed by us unless clearly erroneous. Cummings v. United Artists Theatre Circuit, Inc., 237 Md. 1, 204 A.2d 795, 808 (1964); Warren v. Baltimore Transit Co., 220 Md. 478, 154 A.2d 796, 799-800 (1959). Admittedly, Pittsburgh Terminal did present some evidence, including the testimony of Robert Platt, a qualified financial expert, showing that $55 per share was too low a price for the Western Maryland stock. Valuation is not, however, an exact science, and financial experts frequently differ as to the best methods to value a particular stock. Cummings, 204 A.2d at 808; Northern Acceptance Trust 1065 v. Amfac, Inc., 59 F.R.D. 116, 125 (D.Haw.), aff'd, 485 F.2d 1389 (9th Cir.1973). See also Palmer v. Connecticut Ry., 311 U.S. 544, 559, 61 S.Ct. 379, 384, 85 L.Ed. 336 (1941). The parties differed as to the valuation of the Western Maryland stock, and the district court found from its examination of the evidence that the defendants' method of valuation was more appropriate than Pittsburgh Terminal's suggested methods and that the $55 per share offering price was fair and reasonable. Based upon our review of the record, including the testimony of the defendants' expert witnesses, we cannot determine that the district court's conclusions were clearly erroneous.
 
 
 19
 Pittsburgh Terminal also argued that the $55 per share offering price was unfair because the offering price did not include a premium for Baltimore & Ohio's sale of its controlling interest in Western Maryland to Chesapeake & Ohio. This argument is untenable. Pittsburgh Terminal cited no Maryland or other authority requiring the payment of a premium for the sale of control, but merely asserted that controlling interests are generally worth more than minority interests in a company. Defendants moreover argued that Chesapeake & Ohio did not need to pay a premium for the purchase of a "controlling" interest in Western Maryland because Chesapeake & Ohio, through its control of Baltimore & Ohio, effectively controlled Western Maryland even prior to the sale and therefore did not purchase control of Western Maryland through the sale. Given the lack of authority for Pittsburgh Terminal's position and the facts of this case, we decline to find clearly erroneous the district court's specific finding that the payment of a premium to Baltimore & Ohio was unnecessary.
 
 
 20
 In its attempt to show that the sale of the Western Maryland stock was not fair and reasonable to Baltimore & Ohio, Pittsburgh Terminal additionally challenged the defendants' valuation procedures. Even if the offering price of $55 per share were fair, Pittsburgh Terminal contended that the procedures followed by defendants in valuing the Western Maryland stock were unfair and in violation of Maryland law, which, according to Pittsburgh Terminal, requires, in a self-dealing transaction, not only substantive but also procedural fairness or "fair dealing." Weinberger v. UOP, Inc., 457 A.2d 701 (Del.Supr.1983); Schloss Associates v. C & O Ry., 73 Md.App. 727, 536 A.2d 147 (1988). The district court therefore erred, Pittsburgh Terminal alleged, in concluding that the sale of the Western Maryland stock was fair and reasonable because the offering price was fair, regardless of the valuation procedures followed by defendants.
 
 
 21
 This argument by Pittsburgh Terminal must also fail. Contrary to Pittsburgh Terminal's assertion, we do not interpret the Maryland test for the fairness of a transaction as one involving separate considerations of both "fair price" and "fair dealing." The Delaware Supreme Court, in Weinberger, adopted an approach recognizing fair dealing and fair price as the "two basic aspects" of "the concept of fairness." 457 A.2d at 711. However, no Maryland court has expressly adopted the Weinberger approach, despite Pittsburgh Terminal's contention to the contrary. Walk v. Baltimore & Ohio R.R., 847 F.2d 1100, 1107-08 (4th Cir.1988); Schloss, 536 A.2d at 155-58; Lerner v. Lerner, 306 Md. 771, 511 A.2d 501, 511 (1986). Moreover, even under Delaware law, "fair price" may be regarded as the "preponderant consideration" outweighing other factors in determining the fairness of a non-fraudulent transaction. Weinberger, 457 A.2d at 711. As discussed previously, the district court found that the defendants' method of valuation was appropriate and that the offering price was fair. We conclude, therefore, that the challenged sale of the Western Maryland stock was fair, despite Pittsburgh Terminal's allegations of procedural unfairness, because: (1) Maryland law, unlike Delaware law as expressed in Weinberger, does not explicitly require consideration of the fairness of the defendants' valuation procedures; and (2) even if Maryland had adopted the Weinberger approach, the dominant consideration of the fairness of a transaction remains price. Because the offering price of $55 per share was found to be fair by the district court and because this finding is not clearly erroneous, we uphold the district court's decision that, under Maryland law, Baltimore & Ohio's sale of its Western Maryland stock was a fair and reasonable transaction.
 
 
 22
 Even assuming the Weinberger approach to be applicable in Maryland, we note that the district court's findings do not support a conclusion that the defendants acted in a procedurally unfair manner. The district court did state that the "defendants' method of proceedings and attention to detail left a lot to be desired" and that "there were a lot of things that could have been done but were not done." Despite its criticism of the defendants' valuation procedures, the district court did not find the defendants' procedures to be unfair; instead, the district court specifically found that "there was an adequate analysis of information upon which to determine the fair market value" of the stock and that "consideration was given to minority interests in determining fair market value." After reviewing the record, including the testimony of the various witnesses, we cannot conclude that these findings of the district court are clearly erroneous. Because Pittsburgh Terminal did not establish that the offering price was unfair or that the defendants' valuation procedures were unfair, Pittsburgh Terminal's attempt to show the sale of the Western Maryland stock to be unfair and unreasonable to Baltimore & Ohio must consequently fail.
 
 
 23
 Finally, we decline to reverse the district court's denial of Pittsburgh Terminal's motion to enjoin the merger of Baltimore & Ohio and Chesapeake & Ohio, which was executed in April 1987. In preliminary injunction cases, we must affirm absent a showing of abuse of discretion by the district court. National Board of Y.M.C.A. v. Flint Y.M.C.A., 764 F.2d 199, 200 (6th Cir.1985); American Exploration Co. v. Columbia Gas Transmission Corp., 779 F.2d 310, 313 (6th Cir.1985). Applying the factors that are "particularly important in determining whether a preliminary injunction is proper" to the facts of this case, In re DeLorean Motor Company, 755 F.2d 1223, 1228 (6th Cir.1985), we conclude that the district court committed no abuse of discretion in denying the motion to enjoin the merger because, among other reasons, Pittsburgh Terminal failed to demonstrate a likelihood of success on the merits. As previously discussed, the district court's finding that the sale of the Western Maryland stock for $55 per share was fair and reasonable is not clearly erroneous. Given such a finding by the district court and our interpretation of the applicable Maryland law, as described above, we believe that Pittsburgh Terminal failed to establish a likelihood of success on the merits. Consequently, we affirm the district court's denial of Pittsburgh Terminal's motion to enjoin the merger between Baltimore & Ohio and Chesapeake & Ohio.
 
 
 24
 Based upon our discussion, we affirm the decision of the district court that Baltimore & Ohio's sale of its stock in Western Maryland for $55 per share was fair and reasonable to Baltimore & Ohio. Because of our decision on the merits of this case, we need not address and we express no opinion as to the defendants' motion to dismiss Pittsburgh Terminal's appeal on the ground that Pittsburgh Terminal lacked standing to pursue its derivative action.
 
 
 25
 The judgment of the district court is affirmed.
 
 
 
 [1]
 However, the number of Western Maryland shares publicly traded were so few that the market price of the stock may not have any real relevance to the question of correctly valuing the Western Maryland stock