PUMPHREY ET UX. *v.* PELTON

[No. 266, September Term, 1967.]

*Decided August 19, 1968.*

The cause was argued before HAMMOND, C. J., and MAR-BURY, BARNES, FINAN, SINGLEY and SMITH, JJ.

*W. Harvey Beardmore,* with whom were *Rouse and Beardmore* on the brief, for appellants.

*Frank C. Serio,* with whom were *Wray and Serio* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court.

Appellants (Pumphrey) entered into a contract on March 22, 1956, relative to the operation of "Dairy Queen" stores in the Linthicum area of Anne Arundel County. The contract was

originally with Ella L. Kelly, et al., (Kelly) and was by them assigned to appellee (Pelton). In the Dairy Queen operation Pelton held the state franchise. He assigned the franchise for certain counties to Kelly in 1951, which contract was assigned back to Pelton by Kelly in 1961.

Dairy Queen markets what is known in the trade as a "soft" ice cream or ice milk. The contract included the right to use the registered trade name "Dairy Queen" and certain patented equipment.

By the terms of the contract Dairy Queen was to be the only product sold on the premises without the written permission of Kelly and, later, Pelton. Pumphrey sold other products without such written permission. This originally was with the knowledge of Kelly and later with the knowledge of Pelton.

Kelly and two other Dairy Queen operators testified as to sales of non-Dairy Queen products by other franchise holders in Pelton's territory with Pelton's knowledge and without his written consent. Pelton admitted this.

On December 11, 1964, Pelton through counsel notified Pumphrey of his violation of that part of the contract requiring written permission for such sales, stated that the default of performance gave Pelton the right to terminate, advised of a willingness to negotiate a supplementary agreement and requested that appellants or counsel communicate with Pelton's counsel by December 31. There had been an earlier suggestion that Pumphrey pay Pelton three and one-half percent of his gross food sales, a suggestion which failed to meet with the approval of Pumphrey.

On December 31, 1964, Pelton addressed a letter to Pumphrey wherein he stated that he exercised the option contained in the franchise agreement to declare the agreement void by virtue of the violations on the part of Pumphrey. He further declared his intention to purchase certain of the equipment at a price to be determined by appraisal in accordance with the agreement. He invoked Clause 23 of the contract, which provided:

> "23. The Second Party further agrees that after the termination of this contract for any reason whatsoever the Second Party will not engage in the business

of selling, producing, manufacturing, or delivery of frozen dessert products of any nature whatsoever, including, but not limited to, ice cream, sherbert, frozen custards, and ice mixes, or in any business relating to the same directly or indirectly, in the counties of Cecil, Anne Arundel, Harford and Baltimore, in the State of Maryland, for a period of ten (10) years after the termination of this contract."

On October 1, 1965, Pelton filed his bill of complaint in the Circuit Court for Anne Arundel County alleging that the franchise agreement was "properly terminated," attaching a copy of the letter of December 31 as an exhibit. He asked that Pumphrey be enjoined from selling, producing, manufacturing or delivering frozen dessert products in accordance with the franchise agreement and that he be required to sell to Pelton each Dairy Queen freezer in accordance with the terms of the contract.

Pelton urged in his argument to the chancellor that he was entitled to cancel the contract because of the alleged violations by Pumphrey and also that he was not obliged to renew the contract after March 22, 1965, for a subsequent year. Pumphrey contended below and here contends that his violations of the contract were not "substantial," although admitting that food sales for which no written consent had been obtained amount to approximately fifty percent of his gross sales. He also contended that the restriction against selling ice cream and other products after termination was an unreasonable restriction of trade.

The chancellor found violations of the contract by Pumphrey. He granted the injunction prayed by Pelton enjoining Pumphrey "from engaging in the business of selling, producing, manufacturing, or delivery of frozen dessert products of any nature whatsoever, or in any business relating to the same, directly or indirectly, for a period of ten years * * *." He limited the injunction, however, to the territory covered by the Pumphrey franchise, finding in his opinion "that to enforce Section 23 of the contract prohibiting the above in the four counties of Cecil, Anne Arundel, Harford and Baltimore would

not be equitable and that such prohibition should extend only to the area where the Defendants had exclusive protection during the time in which the contract was enforced. *Roane, Inc. v. Tweed,* [89] A. 2d 548 (Delaware, 1952)."

Clause 19 of the contract said:

> "19. The Second Party and First Party agree each with the other, that this contract shall continue for a term of 5 years from the date hereof and thereafter shall be automatically renewed for successive terms of one year each; and the time limit for the exclusive operating rights of said equipment and use of the registered trade name 'Dairy Queen' in the prescribed territory shall be for the period of time covered by said patents and copyrights and any extensions thereof, so long as the Second Party herein perform their covenants as required by this contract."

It is our opinion that we must first determine the duration of the contract in the light of the attempt of Pelton to cancel as of the end of the year (March 22). The contract contains no provisions for notice of intent to renew. Accordingly, it is not to be confused with an option to terminate or renew, the renewal provisions being automatic. See 17 Am. Jur. 2d, *Contracts,* § 495. We believe a fair reading of this contract is: it is terminable only for cause, by the expiration of the patents and copyrights of Dairy Queen, or by breach of one of the covenants of the contract. The fact that Clause 19 provides that it terminates upon the expiration of the patents and copyrights saves it from the rule that a contract may not exist in perpetuity in the absence of an express provision.

In this case Pelton testified he was familiar with the Kelly operation prior to his taking it over in 1961. He was aware that Kelly made periodic inspections among his various operators. Each operator had a contract similar to that of Pelton. Pelton was aware and assumed Kelly to have been aware that each of those operators prior to the assignment to Pelton was selling non-Dairy Queen products without the written consent of Kelly. Pelton further testified that at the convention he held at Carvel Hall Hotel in Annapolis of Dairy Queen operators in 1962 he

had one of his operators talk relative to food. At one point Pelton was asked:

> "Well, let me ask you this question, Mr. Pelton, weren't you trying to encourage these men to sell food along with the Dairy Queen products?"

To which he replied:

> "I was trying to explore the possibility and to submit to these people other people's experience. I felt that it should be entered into. For, in doing so, would—it would be hopeful of helping them building their business, helping them make more money and helping me make more money. There is a economic reason behind all, of everything that you do."

Pelton admitted that at that convention he said those who were already selling food could continue to sell food, the same kind of food that they had sold.

In 1963 Pelton (as did Dairy Queen nationally) encouraged his people to enter into a franchise agreement relative to "The Brazier" food program and operators were advised that this was the only approved program. Under that program five percent of the gross proceeds from the sale of food would have accrued to Pelton. Notwithstanding that, however, Pelton testified those who were already in the sale of food in 1963 were allowed to continue without paying him anything. He announced, however, that those who were *not* selling any non-Dairy Queen products who did not wish to go into the Brazier program could go into the sale of food upon the payment of three and one-half percent of the gross sales to him.

In *National School Studios v. Mealey*, 211 Md. 116, 126 A. 2d 588 (1956), speaking through Judge Collins, we said, at page 131:

> "It has been held in this State that one may waive the breach of the contract and later be bound by his election. *Key v. Dent*, 6 Md. 142; *Orem v. Keelty*, 85 Md. 337, 36 A. 1030. 'He who is silent when he ought to have spoken, will not be heard to speak when

he ought to be silent.' *Jaworski v. Jaworski,* 202 Md. 1, 10, 95 A. 2d 95; *Burke v. Burke,* 204 Md. 637, 647, 106 A. 2d 59."

In *John B. Robeson v. Gardens,* 226 Md. 215, 172 A. 2d 529 (1961), Judge Prescott (later Chief Judge) said, at pages 222-224:

"There are few principles of contract law better established, or more uniformly acknowledged, than that a party to an executory bilateral contract, who keeps the same in existence after a known breach by the other party and accepts further performance from the party who has committed the breach, waives the breach, in the absence of an assertion of his intention to retain the rights accruing to him as a result of said breach, assented to by the other party; and if the injured party thereafter does not make good his promises of performance, he is responsible for such failure. 3 Williston, *Contracts* (Rev. ed.), § 688, states it thus:

'The principle is general that whenever a contract not already fully performed on either side is continued in spite of a known excuse, the defense thereupon is lost and the injured party is himself liable if he subsequently fails to perform, unless the right to retain the excuse is not only asserted but assented to.'

"In Restatement, *Contracts,* § 309, we find:

'Where the duty of a party to a bilateral contract has been discharged by the failure of a condition to exist or to occur or by the actual or threatened non-performance of a return promise, he is again subjected to the duty if he renders any further performance, or assents to the rendering by the other party of any further performance of a condition or promise beyond what is due as the exchange for performance previously rendered, provided that he renders or assents to such further performance

(a) with knowledge of the facts establishing his discharge, or * * *.'

"See particularly *Comment a,* thereunder. Professor Corbin states the same principle in 3 A Corbin, *Contracts,* § 755.

"The above authorities have been specifically cited, with approval, by this Court in *Nat. School Studios v. Mealey,* 211 Md. 116, 126 A. 2d 588, *Nichols v. Nicholas,* 217 Md. 79, 141 A. 2d 746, and *Gould v. Transamerican Associates,* 224 Md. 285, 167 A. 2d 905; and they correctly expound the law of this State. In the *Mealey* case, the rule was applied to a salesman of school children's photographs, who had a known excuse for nonperformance of his contract of employment, but continued to perform for a while and then breached a term of the contract. In *Nichols v. Nicholas,* we held that the owners of certain real property had waived the time provision of an option agreement by continuing to accept payments on account of the purchase price after the expiration date of the time provision. For recent decisions of this Court dealing with the question of waiver, see *Eastover Stores, Inc. v. Minnix,* 219 Md. 658, 150 A. 2d 884 and *Hill v. Benevicz,* 224 Md. 79, 167 A. 2d 104. Compare 1 American Law of Property, § 3.95.

"The early case of *Md. Fertilizing Co. v. Lorentz,* 44 Md. 218, also illustrates the principle here being discussed. That case involved an agreement to ship 12,000 carboys of oil at the rate of 2,000 carboys per month for six consecutive months. After the shipper had absolutely defaulted in one month and partially defaulted in two others, full shipments were resumed and accepted. The acceptance of the later shipments was held to constitute a waiver of the purchaser's right to terminate the contract and to deny the seller's right to continued performance."

In *Mascaro v. Snelling and Snelling of Baltimore, Inc.,* 250 Md. 215, 235, 243 A. 2d 1, we said:

"As Judge Learned Hand said in the Second Circuit's opinion in *Dwinell-Wright Co. v. White House Milk*

*Co.,* 132 F. 2d 822, 825 (2d Cir. 1943) : 'Here, as often, equity does not seek for general principles, but weighs the opposed interests in the scales of conscience and fair dealing.' Putting this another way, equitable estoppel may bar the relief sought. In the *White House* case, the complainant knew of the defendant's use of the brand name on its cans of evaporated milk, and was selling White House tea and coffee to the defendant for resale. In denying relief, the court said '* * * the owner may have so conducted himself as impliedly to assure the newcomer that he does not object, and the newcomer may have built upon that assurance.' 132 F. 2d at 825.

"Or, as was said in *Holly Hill Citrus Growers' Assn. v. Holly Hill Fruit Products, Inc.,* 75 F. 2d 13, 17 (5th Cir. 1935) :

'There is a kind of evidential estoppel which, though it may not amount to a complete estoppel in pais, is raised when persons who have spoken or acted one way under one set of circumstances, and with one objective in mind, undertake under other circumstances and when their objective has changed, to testimonially give a different color to what they formerly said and did.' "

Pelton relies upon and the chancellor cited Clause 18 of the contract which reads:

"No waiver, in whole or in part, of any breach or violation of this contract shall be deemed a waiver of any subsequent breach or violation."

In *Johnson Lumber Co. v. Magruder,* 218 Md. 440, 447-448, 147 A. 2d 208 (1958) Judge Prescott (later Chief Judge) for this Court said:

"The whole doctrine of equitable estoppel is a creature of equity and governed by equitable principles. It was educed to prevent the unconscientious and inequitable assertion of rights or enforcement of claims which might have existed or been enforceable, had not the

conduct of a party, including his spoken and written words, his positive acts and his silence or negative omission to do anything, rendered it inequitable and unconscionable to allow the rights or claims to be asserted or enforced."

See also *Travelers v. Nationwide,* 244 Md. 401, 414, 224 A. 2d 285 (1966) and cases there cited.

The conduct of parties to a contract may be evidence of a subsequent modification of their contract. *Williston on Contracts,* 3rd Ed., sec. 623; *Saul v. McIntyre,* 190 Md. 31, 36, 57 A. 2d 272; *Evergreen Amusement Corporation v. Milstead,* 206 Md. 610, 616-617, 112 A. 2d 901; and *Solomon's Marina, Inc. v. Rogers,* 221 Md. 194, 198, 156 A. 2d 432. Cf. *Walker v. Assoc. Dry Goods,* 231 Md. 168, 179, 189 A. 2d 91.

In this case the breach was a continuing one. The Pumphrey sales of non-Dairy Queen products were not a series of broken incidents. They apparently began at the inception of the contract. Certainly, they continued with the full knowledge of Pelton from the time that Pelton first became involved. They continued with Pelton's acquiescence up until the fall of 1964. At that time Pelton began to request three and a half percent of the gross proceeds of the sales if he were not to then object to the sale of non-Dairy Queen products. As stated earlier, however, Pelton himself testified that in 1963 he stated publicly to his assembled franchise holders that those who were then selling non-Dairy Queen products might continue to do so without paying him anything.

The conduct of the parties here may be interpreted as evidence of a subsequent modification of the contract to permit the sale of non-Dairy Queen products by Pelton. Regardless of such modification, we hold that Pelton by his conduct as expressed by his own testimony has waived his right to object to the sale of non-Dairy Queen products by Pumphrey. The sale of non-Dairy Queen products by Pumphrey was a continuous matter. Therefore, this was a continuing waiver, not a series of waivers to which Clause 18 might be applicable. He could waive Clause 18 as well as any other part of the contract.

Having agreed by his conduct to a modification of the contract or, in the alternative, by his conduct having waived Pumphrey's breach, Pelton may not now terminate the contract on the ground of Pumphrey's sale of non-Dairy Queen products without the written consent of Pelton.

We do not reach the question of whether the restriction against selling ice cream after the termination of the agreement was an unreasonable restraint of trade.

> *Reversed and remanded for entry of a decree in accordance with this opinion. Costs to be paid by appellee.*