750 A.2d 709 (2000)
131 Md. App. 32
Lawrence E. LERNER
v.
LERNER CORPORATION, et al.
No. 938, Sept. Term, 1999.
Court of Special Appeals of Maryland.
May 1, 2000.
*711 Leonard N. Bebchick, Washington, DC (Douglas M. Bregman, Mark A. Gilday and Bregman, Berbert & Schwartz, Bethesda, on the brief), for Appellant.
Albert D. Brault (James M. Brault and Brault, Graham, Scott & Brault, LLC, Rockville, James H. Hulme, Stephanie A. Rigaux and Arent, Fox, Kitner, Plotkin & Kahn, PLLC, Washington, DC, on the brief), for Appellees.
Argued before MURPHY, C.J., and WENNER and EYLER, JJ.
*710 EYLER, Judge.
The issues presented by this case arise out of a multi-year dispute between Lawrence E. Lerner, appellant (Lawrence), and Theodore N. Lerner, appellee (Theodore), no strangers to the litigation process. Lawrence and Theodore are brothers who, for many years, were jointly engaged in the business of buying, selling, developing, and managing real estate. Lerner Corporation, another appellee (Lerner Corporation or the Corporation), a subchapter S corporation incorporated under the laws of the State of Maryland, was the primary business entity through which the brothers operated.
Lerner Corporation, a closely held corporation but not a "close corporation" within the meaning of Maryland corporation law, was organized in 1965. It was authorized to issue ninety-five shares of no-par common stock. Theodore acquired seventy shares, and Lawrence acquired twenty-five shares. Theodore was president and one of three directors. Prior to September 1983, Lawrence was secretary and a director.
The brothers' relationship deteriorated, and in September 1983, Theodore caused Lawrence to be removed as an officer and director. Lawrence sued Theodore, Theodore undertook to "freeze-out" Lawrence as a stockholder, and Lawrence brought an action to enjoin the freeze-out. The Court of Appeals affirmed the trial court's entry of a preliminary injunction. See Lerner v. Lerner, 306 Md. 771, 511 A.2d 501 (1986). Prior to trial of that case, however, the brothers entered into a settlement agreement dated October 16, 1987 (Settlement Agreement or the Agreement). The Settlement Agreement provided that (1) Theodore would remain the chief operating officer of Lerner Corporation, (2) Lawrence would no longer be involved actively in Lerner Corporation but would continue to receive shareholder distributions, and (3) Theodore would have permission to use the resources of Lerner Corporation to benefit his other financial projects.
Disputes arose with respect to implementation of the Settlement Agreement. See, e.g., Lerner v. Lerner, 101 Md.App. 728, No. 1914, September Term 1993 (Maryland Court of Special Appeals filed September 30, 1994)(unreported), and Lerner v. Lerner Corp., 122 Md.App. 1, 711 A.2d 233 (1998). We see no need to repeat in this opinion the matters decided in the prior appeals. This case once again raises issues concerning the meaning and application of the Settlement Agreement, as well as questions of corporate law.

Facts
Appellant directs us to two paragraphs in the Settlement Agreement as relevant to the issues presented. Paragraph 5 provides: "LEL [Lawrence] shall continue as a shareholder of Lerner Corp. which itself *712 shall continue with TNL [Theodore] as a shareholder." Paragraph 10, in pertinent part, grants Lawrence the right to receive a proportionate annual distributive share of income plus a preemptive right to purchase a proportionate share of any subsequent offering of Lerner Corporation's common stock.
Lerner Corporation sold stock in late 1995, but Lawrence elected not to purchase additional shares. All the shares were purchased by Theodore, increasing Theodore's interest to 89.9% and decreasing Lawrence's interest to 10.1%. In May 1998, Lerner Corporation again sold stock, at which time Lawrence purchased fourteen shares to maintain his proportionate interest.
Subsequent to that sale, Lerner Corporation gave Lawrence notice of a special shareholders meeting to be held on August 24, 1998. The purpose of the meeting was to consider a proposed amendment to the Corporation's charter. The effect of the amendment was to reclassify and convert each of the Corporation's common shares into 1/68th of a share, a "reverse stock split," which would have the effect of reducing Lawrence's interest to less than one share. The amendment provided that, in lieu of the issuance of fractional shares, Lawrence would be paid the fair value of his stock. This would eliminate Lawrence as a shareholder and convert his interest to cash. The notice was issued pursuant to authorization by the board of directors at a meeting held on August 11, 1998.
On August 21, 1998, Lawrence filed suit in the Circuit Court for Montgomery County, seeking a declaratory judgment, an injunction to prevent the reverse stock split, or, if not enjoined, rescission. The court issued a temporary restraining order to prevent adoption of the amendment, conditioned on posting a $100,000 bond. Lawrence failed to post adequate security, and the amendment was adopted on August 26, 1998. On January 4 through 6, 1999, the case proceeded to a non-jury trial on appellant's claim for rescission and declaratory relief. On June 11, 1999, the circuit court rendered a decision, ruling in favor of appellees.
At trial, Lawrence argued that the reverse stock split was not permissible because Lerner Corporation failed to demonstrate a legitimate business reason and because it violated the terms of the Settlement Agreement. Appellees responded that there was a legitimate business reason for the reverse stock split, there was no fraud or unfairness, and it was not precluded by the Settlement Agreement.
The circuit court ruled that the Settlement Agreement did not address the issue of duration. The court thus implied a reasonable time for its duration, finding that the approximate ten years, ten months time that had elapsed from the inception of the Settlement Agreement to the reverse stock split was a reasonable time. Second, the circuit court stated that the Settlement Agreement did not contemplate the "continued interference" by Lawrence that was found to exist. Third, the circuit court discussed the legal standard to be applied to judicial review of the reverse stock split and stated that, while the exact standard was unclear, it was either fraud, fairness, or business purpose. The court, after concluding there was no evidence to show fraud or unfairness, found there was a business purpose based on (1) the history of contentious litigation, (2) the likelihood that it would continue, (3) the need to maintain the subchapter S status of the Corporation that had been threatened by Lawrence's efforts, and (4) the need to maintain adequate cash reserves. Consequently, the court denied rescission and held that the charter amendment was not in violation of the Settlement Agreement and that appellees had not breached their legal duties.

Issues Presented
Appellant frames the issues as follows:
1. Did the Circuit Court err in terminating the 1987 Settlement Agreement among appellant Lawrence *713 and appellees Theodore and the Corporation by creating and imposing a term of eleven years upon all of Lawrence's contractual rights arising thereunder, including, in particular, Lawrence's right to continue as a stockholder and to receive an annual distributive share of income?
2. Did the Circuit Court err in holding that Lawrence's actions lawfully justified and supported the entry of a judicial decree effectively terminating the 1987 Settlement Agreement?
3. Did the Circuit Court err in concluding that the Corporation lawfully had adopted and could implement a 1998 reverse stock split designed to wholly eliminate Lawrence's position as a minority stockholder?

Motion to Take Judicial Notice
Appellant filed in this Court a motion to take judicial notice, which we shall address prior to addressing the issues set forth above. First, appellant asks this Court to take judicial notice of (1) an order awarding supplemental judgment dated October 19, 1998, and (2) a notice of judgment, entered October 27, 1998, both by the Circuit Court for Montgomery County in Lerner, et al. v. Lerner Corporation, et al., No. 77954 Civil. The orders relate to proceedings on remand as the result of this Court's unreported opinion in Lerner v. Lerner Corporation, No. 1914, September Term 1994 (filed September 30, 1994). Appellant suggests that notice is required to provide this Court with a full chronology of the dispute among the parties. Second, appellant asks us to take judicial notice of Lerner Corporation's offer to sell stock dated May 18, 1998. This document was not admitted into evidence.
Maryland Rule 5-201 provides that a court may take judicial notice of adjudicative facts. The rule further provides that "[j]udicial notice may be taken at any stage of the proceedings." Md. Rule 5-201(f). As such, an appellate court may take judicial notice. See generally Joseph F. Murphy, Maryland Evidence Handbook § 1000, at 409 (3rd ed.1999) ("an appellate court may take judicial notice of a fact not judicially noted by the trial judge"); 5 Lynn McLain, Maryland Evidence § 201.1 n.6, at 90 (1987 & Supp.1995) (citing cases in which Maryland appellate courts have taken judicial notice).
The doctrine of judicial notice substitutes for formal proof of a fact "when formal proof is clearly unnecessary to enhance the accuracy of the fact-finding process." Smith v. Hearst Corp., 48 Md.App. 135, 136, 426 A.2d 1 (1981). A court may judicially note facts that readily can be determined by examination of a source whose accuracy cannot be reasonably questioned. Md. Rule 5-201(b). Included among the categories of things of which judicial notice may be taken are "facts relating to the ... records of the court." Smith, 48 Md.App. at 136 n. 1, 426 A.2d 1. In McCormick's treatise on evidence, it is said to be "settled, of course, that the courts, trial and appellate, take notice of their own respective records in the present litigation, both as to the matters occurring in the immediate trial, and in previous trials or hearings." McCormick on Evidence § 330, at 766 (2d ed.1972), quoted with approval in Irby v. State, 66 Md.App. 580, 586, 505 A.2d 552 (1986), cert. denied, 308 Md. 270, 518 A.2d 732 (1987).
Consequently, we take judicial notice of the order and notice of judgment entered by the Circuit Court for Montgomery County in Lerner, et al. v. Lerner Corp., No. 77954 Civil. We decline, however, to take judicial notice of Lerner Corporation's offer to sell stock in that it is not a part of the record, and its accuracy is subject to reasonable dispute and cannot be as readily and accurately ascertained.

Discussion
1. Interpretation of Settlement Agreement
Appellant contends that the circuit court erred when it imposed an "eleven-year *714 term" on the Settlement Agreement. Appellant argues that the Settlement Agreement was lawful and that, pursuant to paragraphs 5 and 10, appellant was entitled to a distributive share for his lifetime or as long as Lerner Corporation exists.
Appellees argue that the Agreement is silent as to duration and such a contract not otherwise terminable at will is enforceable for a reasonable time, and what constitutes a reasonable time is a fact question. Additionally, appellees assert that the restriction in the Settlement Agreement constitutes an unreasonable restraint on alienation, and because appellant is seeking rescission, equity can deny enforcement of a contract when it is unreasonable and enforcement would work a hardship. Appellant responds that a court's ability to impose a reasonable term when a contract is silent is limited to the question of when a party is to render performance. The question, in that situation, is whether the other party is excused from performance or entitled to relief for nonperformance. Appellant argues that the doctrine does not apply because appellant has performed his obligations.
We agree with appellees. Our discussion in Kiley v. First National Bank of Maryland, 102 Md.App. 317, 649 A.2d 1145 (1994), cert. denied, 338 Md. 116, 656 A.2d 772, cert. denied, 516 U.S. 866, 116 S.Ct. 181, 133 L.Ed.2d 120 (1995), is instructive here:
Depending upon the intention of the parties, a contract, silent as to duration, may contemplate perpetual performance, performance for a reasonable time, or performance until the parties decide otherwise. But Williston and the Restatement (Second) of Contracts agree that, unless expressly provided, promises ordinarily are not interpreted to require perpetual performance. [1 Richard A. Lord, Williston on Contracts ], § 4:19, at 431 [ (4th ed.1990) ]; Restatement (Second) Contracts, § 33, Comment d, at 94 [(1981)]. When courts are required to interpret such imprecise contracts, "some period short of infinity" is usually enforced. Williston, § 4:19, at 434. "[A]bsent a contrary intention being shown by the circumstances, [courts will] interpret a promise which does not in terms state the time of performance as intending performance in or for a reasonable time." Id. Similarly, if a continuing performance was anticipated, but no specific time provision was stipulated in the contract, "the contract contemplates performance for a reasonable time," and is usually terminable at any time by either party. Id., § 4:19 at 442; Restatement (2d) Contracts, § 33.
102 Md.App. at 335-36, 649 A.2d 1145; see also Goldman, Skeen & Wadler v. Cooper, Beckman & Tuerk, L.L.P., 122 Md.App. 29, 46-47, 712 A.2d 1 (1998)("In absence of a specific provision, a reasonable duration will be implied.")(citing Evergreen Amusement Corp. v. Milstead, 206 Md. 610, 617, 112 A.2d 901 (1955)).
The Settlement Agreement at issue did not address duration. Consequently, as a matter of law, it was effective for a reasonable time. See Kiley, 102 Md.App. at 336, 649 A.2d 1145; see also 1 Richard A. Lord, Williston on Contracts § 4:19, at 429-48 (4th ed.1990) (hereinafter "Williston").
Appellant has referred us to cases in other jurisdictions that are either factually inapposite or of little import here. We briefly distinguish those cases. In Galler v. Galler, 32 Ill.2d 16, 203 N.E.2d 577, 586 (1964), a shareholder agreement between two brothers having equal interest in a close corporation did not provide for a specific termination date. The express purpose of the agreement was to provide financial support to the stockholders' immediate families upon their death. Id. at 580. One of the shareholders died. Id. Thereafter, the agreement was challenged and held to be enforceable. Id. at 585-86. Despite a clause in the agreement stating that its terms "`shall be binding upon and shall inure to the benefits of' the legal *715 representative, heirs and assigns of the parties," the court reasoned that the purpose of the agreement was accomplished at the death of the survivor of the parties. Id. at 586. No such express purpose exists in the Settlement Agreement in this case.
In Glazer v. Glazer, 374 F.2d 390, 404 (5th Cir.1967), cert. denied, 389 U.S. 831, 88 S.Ct. 100, 19 L.Ed.2d 90 (1967), the court recognized that, in stockholder agreements, the parties' intention with respect to duration, if not expressly stated, must be construed in light of the whole agreement and should be given a practical construction, looking at it from a point in time prior to existence of the dispute (quoting Hornstein, Corporation Law and Practice § 175, at 209-10 (1959)). The court recognized that such agreements may be construed as revocable at will or as effective so long as the parties live provided "they remain faithful, etc." Id. There, the court held that the determination with respect to the agreement's duration was one for the jury, and the agreement could properly be construed by the jury to continue for a reasonable time, "possibly until the death or complete retirement of one of the brothers." Id. The court's holding, that the question of whether an agreement is enforceable for a reasonable time is a question of fact, does not advance appellant's argument.
In Wasserman v. Rosengarden, 84 Ill.App.3d 713, 40 Ill.Dec. 430, 406 N.E.2d 131 (1980), a minority shareholder, who had been ousted as a corporate officer, sued two fellow shareholders and the corporation, seeking an accounting, corporate dissolution, and remuneration for a period subsequent to his termination. Id. at 714, 40 Ill.Dec. 430, 406 N.E.2d 131. The shareholders' agreement provided that the shareholders would receive equal salaries and share equally in distributed profits for so long as the parties remained shareholders or the corporation remained in existence. Id. at 717, 40 Ill.Dec. 430, 406 N.E.2d 131. In Wasserman, the shareholders' agreement provided a term limiting its duration, whereas the Settlement Agreement in this case omits a durational term. Moreover, the court in Wasserman did not give consideration to the interpretation or construction of the agreement's duration.
Similarly, Compton v. Paul K. Harding Realty Co., 6 Ill.App.3d 488, 285 N.E.2d 574 (1972), did not involve the issue of duration. Rather, the case stands for the proposition that an agreement without a termination date is not void on the ground of vagueness. Id. at 579. Maimon v. Telman, 40 Ill.2d 535, 240 N.E.2d 652, 655 (1968), held that a joint-venture agreement without a specified duration was terminable at will where the court could not determine when the purpose of the agreement would be accomplished. Marcy v. Markiewicz, 233 Ill.App.3d 801, 175 Ill.Dec. 37, 599 N.E.2d 1051 (1992), regarded a reciprocal right of first refusal with respect to the sale of an apartment building contained in a partnership dissolution agreement. There, the court held the right did not violate the rule against perpetuities, inasmuch as it was personal to the holder of the right and his sons. Id. 175 Ill.Dec. 37, 599 N.E.2d at 1058.
Appellant further contends that the term limit was imposed in error because the trial court made no finding of ambiguity and considered no evidence regarding the duration of the agreement. First, we note that appellant did testify regarding his understanding of the duration of the agreement. Contrary to appellant's implicit assertion, the trial court was not required to accept appellant's testimony regarding his subjective understanding of the agreement's duration.
Second, and more important, in the absence of an express term limit, a court must first interpret the agreement to determine if the agreement unambiguously omitted the term or if a term was present but ambiguous. We have already determined the court was correct in determining the Settlement Agreement fell into the *716 first category. The process for supplying a missing term is not the same as the process for making a factual determination to clear up an ambiguous term.
The Restatement (Second) of Contracts provides that, when the parties to a contract have not agreed with respect to a term that is essential to a determination of their rights and duties, a term that is reasonable under the circumstances may be supplied by the court. See Restatement (Second) of Contracts § 204 (1981). The commentary to this provision notes that, while interpretation may be necessary to determine that the parties have not agreed with respect to a particular term, the supplying of an omitted term is not technically within the Restatement's definition of interpretation, which consists only of ascertaining the meaning of a promise or agreement, and not whether omitted terms exist or whether terms should be supplied. See Restatement (Second) of Contracts § 204 comment c (1981)(referring to the definition of interpretation in Restatement (Second) of Contracts § 200 (1981)). The treatise Corbin on Contracts similarly provides that "a situation in which construction, rather than interpretation, occurs is a court's action in filling a gap in the terms of a contract." Margaret N. Kniffin, 5 Corbin on Contracts § 24.3, at 9 (Rev. ed.1998) (hereinafter "Corbin").
When an agreement is silent as to duration, a reasonable duration will be implied by the court. In determining what constitutes a reasonable duration, reference should be made to the subject matter of the agreement. See Goldman, Skeen, 122 Md.App. at 47, 712 A.2d 1 (citing Pumphrey v. Pelton, 250 Md. 662, 665, 245 A.2d 301 (1968)); 1 Williston, § 4:19, at 429; Restatement (Second) of Contracts § 204 comment d (1981). The treatises are in accord with respect to this premise. For example, Corbin on Contracts provides that "If a court attempts to determine what meaning a reasonable person would have given to promissory words at the time of formation of the contract, this is largely an effort to produce a result reasonable under the circumstances both at the moment of agreement and subsequently when enforcement is sought." 5 Corbin, § 24.29, at 320 (emphasis added). In Williston on Contracts, it states that "courts frequently interpret promises requiring continued performance for a reasonable time or until terminated by reasonable notice. In every case of this sort, all the circumstances surrounding the transaction must be considered in reaching an appropriate conclusion." 1 Williston, § 4:19, at 446-47 (footnotes omitted) (emphasis added).
We conclude from the above discussion that there is a conceptual difference more than one of semanticsbetween the process for construing an ambiguous agreement to determine the intention of the parties and determining a reasonable duration for an agreement when the parties failed to provide for its duration. In the latter case, attempting to determine the intention of the parties and to give such intention efficacy is relevant, but the court may consider all relevant circumstancesincluding circumstances as of the time of entering into the agreement, events thereafter, and considerations of policy and fairness.
In the instant case, the circuit court considered the totality of the circumstances and concluded as a matter of fact that the period of time that had elapsed before the reverse stock split, just short of eleven years, was a reasonable period of time. We hold that the court's determination was not clearly erroneous.

2. Breach of Settlement Agreement
Appellant reads the circuit court opinion as holding in the alternative that the Settlement Agreement was properly terminated because Lawrence committed a material breach of the Agreement by virtue of his "continued interference." Appellant argues that pursuit of litigation by Lawrence was not a breach of the Settlement Agreement *717 and that Lawrence in fact prevailed on various issues in the prior litigation. Even with respect to issues on which Lawrence did not prevail, according to appellant, the litigation was not meritless. In light of our disposition of the first issue, we see no need to address this issue.
3. Reverse Stock Split
Appellant contends that, even if not barred by the Settlement Agreement, the reverse stock split was unlawful. Appellant assumes that the appropriate test to be applied is whether there was a proper business purpose for the reverse stock split. Appellant argues that there was no valid business purpose because the purpose was to end any further efforts by Lawrence to enforce his contractual rights and to eliminate him as a shareholder.
The reasons for the reverse stock split were set forth in the minutes of the board of directors. The minutes recited that the Settlement Agreement limited Lerner Corporation's ability to retain profits for working capital needs because profits had to be distributed on a current basis. The result was that stock had to be sold to repay loans or finance new purchases and to provide working capital. The minutes also indicated that Lawrence acted to frustrate stock sales and that eliminating him as a stockholder would remove a major obstacle to raising additional capital.
Appellant argues that after the stock offering in May 1998, Lerner Corporation was flush with cash, and the facts did not support the board resolution. Appellant recognizes that the circuit court found that the freeze-out was justified (1) to enable Lerner Corporation to maintain cash reserves, (2) to avoid litigation costs, (3) because dissension was impairing the Corporation's ability to conduct business, and (4) to enable Lerner Corporation to avoid the loss of subchapter S status. Appellant asserts that there is nothing in the record to support those findings.

a. Exclusivity of Appraisal Remedy
In response, appellees first assert that the Maryland appraisal statute, Md.Code, Corps. & Ass'ns §§ 3-202 to 3-211 (1999), provides the exclusive remedy for a minority shareholder and that traditional forms of equitable relief are not available as a matter of law.
We disagree that the Maryland appraisal statute is the exclusive remedy for a minority shareholder. Nothing in either the existing statute or its predecessors indicates that the remedy of an appraisal proceeding was intended to be exclusive. See Twenty Seven Trust v. Realty Growth Investors, 533 F.Supp. 1028, 1036 (D.Md.1982); Walter J. Schloss Assocs. v. Chesapeake & Ohio Ry. Co., 73 Md.App. 727, 738, 536 A.2d 147 (1988); see also James J. Hanks, Jr., Maryland Corporation Law, § 10.8, at 342-43 (1990 & Supp.1999).
It is clear that a court may grant injunctive relief under appropriate circumstances. Lerner v. Lerner, 306 Md. 771, 778-82, 511 A.2d 501 (1986); Homer v. Crown, Cork & Seal Co., 155 Md. 66, 141 A. 425 (1928) (an injunction can lie when there is fraud); Walter J. Schloss Assocs., 73 Md.App. at 737-44, 536 A.2d 147. In our view, the relief available also includes rescission and monetary relief outside of the appraisal remedy. In Walter J. Schloss Assocs., a case-involving a cash out merger, we stated that a remedy other than an appraisal proceeding is only available, however, "under very limited circumstances," involving allegations, and ultimately proof, of "`specific acts of fraud, misrepresentation, or other items of misconduct [demonstrating] the unfairness of the merger terms to the minority.'" Id. at 743-47, 536 A.2d 147, (quoting Weinberger v. UOP, Inc., 457 A.2d 701, 703 (Del.1983)); see also Hanks, supra, § 10.8.

b. Propriety of Reverse Stock Split
We turn then to the propriety of the reverse stock split. As previously mentioned, appellant contends that the reverse stock split was unlawful. Appellees argue *718 that, even if the appraisal remedy is not exclusive, the circuit court's holding was not erroneous, regardless of whether the test for impropriety is fraud, the existence of a valid business purpose, or fairness. Appellees assert that appellant never pursued nor offered evidence of fraud or unfairness. Appellees assert that the Court of Appeals in Lerner v. Lerner, 306 Md. 771, 511 A.2d 501 (1986), expressly did not decide, absent fraud, if the test should be whether there was a proper business purpose or fairness. Appellees argue that the business purpose test is not in accord with the modern trend. Even if the test is business purpose, appellees assert that the circuit court's finding was not clearly erroneous.
Specifically, appellees point to the following evidence: (1) The board minutes recited that the action was to eliminate dissension among shareholders that had embroiled the corporation in litigation for more than twelve years at a cost of more than $2,000,000 and had diverted executive officers from managing the corporation; (2) The Corporation's counsel concluded that there was a pattern of irreconcilable family conflict; (3) Lawrence had testified at a deposition that he hated Theodore; (4) The Corporation spent over $2,000,000 in legal fees in litigation with Lawrence; (5) The litigation took the time and effort of the employees of the Corporation; (6) Evidence that Lawrence made false statements about the Corporation; (7) Testimony by the former chief financial officer of the Corporation that, during his ten years as such, he spent a substantial portion of his daily time devoted to litigation with Lawrence and his testimony that document discovery during 1999 consumed over 500 hours.
Again, we agree with appellees. A reverse stock split, or split-down, occurs when a number of shares are combined to form one share.[1] As in this case, a reverse stock split may result in fractional shares. All fifty states and the District of Columbia have adopted statutes addressing fractional shares of a corporation.[2] Maryland is one of only four jurisdictions that does *719 not expressly designate the rights of holders of fractional shares.[3] Nonetheless, the Maryland General Assembly has authorized fractional shares and addressed their handling.[4]See Md.Code, Corp. & Ass'ns, § 2-214(a)(1999). Specifically, section 2-214 of the Corporations and Associations Article of the Maryland Code permits a corporation to eliminate a fractional interest "by rounding off to a full share of stock," or by paying "cash for the fair value of a fractional share of stock determined as of the time when the person entitled to receive it is determined." Id. at (a)(2) & (4). Thus, pursuant to Maryland statute, a corporation has the absolute right to eliminate fractional shares. See id.
Furthermore, the use of a reverse stock split and elimination of fractional shares for the purpose of eliminating minority stockholders, if not within one of the "limited circumstances" discussed above, see Walter J. Schloss Assoc., 73 Md.App. at 743, 536 A.2d 147, is permissible under Maryland law. See Lerner v. Lerner, 306 Md. 771, 511 A.2d 501 (1986). Indeed, as noted by the Court of Appeals in its earlier decision regarding these brothers, Lerner v. Lerner, 306 Md. 771, 511 A.2d 501 (1986), "the statutes give Theodore the power to freeze out Lawrence." Id. at 775, 511 A.2d 501. Maryland is not alone in this respect; other jurisdictions specifically permit reverse stock splits. See Laird v. I.C.C., 691 F.2d 147, 151 (3d Cir.1982), cert. denied, 461 U.S. 927, 103 S.Ct. 2086, 77 L.Ed.2d 297 (1983) (finding that a reverse stock split is legal under Missouri law); Goldman v. Union Bank & Trust, 765 P.2d 638 (Colo.App.1988)(deciding that the Colorado Corporation Code authorized reverse stock split that `froze out' minority stockholders); FGS Enters., Inc. v. Shimala, 625 N.E.2d 1226 (Ind.1993) (ruling that the Indiana General Corporation Act permits stock splits in which corporation acquired fractional shares).
Notwithstanding, at least one state limits this statutory right. The California Corporations Code permits a corporation to pay cash for fractional shares but adds a proviso that a corporation may not do so if such action would result in the cancellation of more than ten percent of the outstanding shares of any class of stock. See Cal. Corp.Code § 407 (West 1988). A treatise addressing the rights of minority shareholders, F. Hodge O'Neal & Robert B. Thompson, O'Neal's Oppression of Minority Shareholders § 5:11 (2d ed.1997), after *720 describing the typical reverse split and the cashing out of fractional shares, states:
The California Corporation Code is unusual among state statutes in that it limits this kind of squeeze-out. The Code permits a corporation to pay cash for fractional shares but adds a proviso that a corporation may not do so if such action would result in the cancellation of more than 10 percent of the outstanding shares of any class. The provision is designed to prevent the use of a reverse stock split unless the majority owns at least 90 percent of the shares.
(endnotes omitted).
Notwithstanding the permissibility of a reverse stock split in Maryland as well as elsewhere, we must consider the duties of a majority stockholder to a minority stockholder in a closely held corporation and the appropriate standard applicable to such a transaction that results in the elimination of a minority stockholder. In the earlier Lerner case, the Maryland Court of Appeals expressly declined to answer that question.
It is well settled in Maryland that minority shareholders are entitled to protection against the fraudulent or illegal action of the majority. See Mottu v. Primrose, 23 Md. 482, 501 (1865). When a majority stockholder abuses its power, a minority stockholder is entitled to appropriate relief. See Twenty Seven Trust, 533 F.Supp. at 1034; Baker v. Standard Lime & Stone Co., 203 Md. 270, 283, 100 A.2d 822 (1953). A majority stockholder in a close corporation owes a fiduciary obligation not to exercise that control to the disadvantage of minority stockholders. See generally O'Neal & Thompson, supra, § 3:10, at 103 ("In view of the intimacy among participants in a close corporation (who usually think of themselves as partners), courts should be, and are, more inclined to impose a fiduciary duty on shareholder-director-officers of a close corporation in their dealings with a fellow shareholder than they are to impose a fiduciary duty on directors, officers, or shareholders of a publicly held corporation.") (endnote omitted).
In Lerner v. Lerner, 306 Md. 771, 511 A.2d 501 (1986), the Court of Appeals recognized that a majority of courts that had considered challenges to freeze-outs, at that time at least, seemed to agree "at least at the conceptual level of legal principle, that the majority may freeze out the minority if there is a business purpose for the action." 306 Md. at 781, 511 A.2d 501. Regardless of the test, the Court of Appeals also recognized that discord within a close corporation could reach a point of impairing its ability to conduct business and eliminating a minority interest would not violate a duty to the minority. Id. at 782, 511 A.2d 501.
The weight of authority indicates that the use of a reverse split and elimination of fractional shares for the purpose of eliminating minority stockholders may raise fairness, business purpose, or other similar issues justifying judicial intervention. See, e.g., Teschner v. Chicago Title & Trust Co., 59 Ill.2d 452, 322 N.E.2d 54 (1974), appeal dismissed, 422 U.S. 1002, 95 S.Ct. 2623, 45 L.Ed.2d 666 (1975) (holding that a 1-for-600 reverse stock split was valid when there was no claim of fraud or deception, no showing of any improper purpose, and no charge that the price paid for a fractional share was inadequate); Leader v. Hycor, Inc., 395 Mass. 215, 479 N.E.2d 173, 174-75, 177-79 (1985) (holding, when a 1-for-4000 reverse stock split was effected in 1980 following a going public transaction in 1969, that the evidence supported the trial court's rejection of the plaintiff's claim that the recapitalization was not designed to achieve a legitimate business purpose, and remanding on the question of fairness of the price at which fractional shares were to be paid out); Clark v. Pattern Analysis & Recognition Corp., 87 Misc.2d 385, 384 N.Y.S.2d 660, 662, 665 (Sup.Ct.1976) (granting a temporary injunction when no legitimate business purpose was shown for eliminating the minority *721 through a 1-for-4000 reverse stock split).
The article Kaplan & Young, Corporate "Eminent Domain": Stock Redemption and Reverse Stock Splits, 57 UMKC L.Rev. 67 (1988), discusses the reverse stock split procedure in detail, and notes that: "No jurisdiction has any per se rule against squeeze-outs by means of reverse stock splits or otherwise, but majority shareholders must meet certain standards of fairness in their treatment of the minority." 57 UMKC L.Rev. at 74 (citing Lerner v. Lerner, 306 Md. 771, 511 A.2d 501 (1986)). Notwithstanding, courts are not in accord as to the appropriate test to apply in making such a determination. As mentioned previously, Maryland has declined to articulate an approach.
Some jurisdictions incorporate business purpose into the analysis. In particular, New York and Massachusetts appear to have adopted this approach. See, e.g., Schwartz v. Marien, 37 N.Y.2d 487, 373 N.Y.S.2d 122, 335 N.E.2d 334, 338-39 (1975) (requiring a showing of business purpose to justify the sale of treasury stock). In Wilkes v. Springside Nursing Home, Inc., 370 Mass. 842, 353 N.E.2d 657 (1976), the Massachusetts Supreme Judicial Court affirmed that majority shareholders in a close corporation owe a fiduciary duty to the minority, but asserted that the majority had "certain rights to what has been termed `self ownership.'" 353 N.E.2d at 663 (citations omitted). The court applied a strict fiduciary standard to the majority's actions, but observed that such a strict standard might discourage controlling shareholders from taking legitimate actions in fear of being held in violation of a fiduciary duty. Id. In light of this observation, the court adopted a balancing test. Id. This test weighed the majority's right of self-interest against the fiduciary duty owed to the minority considering the following factors: (1) whether the majority could demonstrate a legitimate business purpose for its action, (2) whether the minority had been denied its justifiable expectations by the majority's actions, and (3) whether an alternative course of action was less harmful to the minority's interests. Id. at 663-64. Using this approach, the Wilkes court found that the proper method would be to place the initial burden on the majority shareholder to demonstrate a legitimate business purpose for the actions taken. Id. After such a showing the burden would shift to the minority to show that the same legitimate objective could have been achieved through an alternative course of action less harmful to the minority's interests. Id.
At least one jurisdiction has followed what could be termed the "reasonable expectations" approach. See generally Robert Savage McLean, Minority Shareholders' Rights in the Close Corporation under the New North Carolina Business Corporations Act, 68 N.C. L.Rev. 1109, 1113-16 (1990) (discussing the reasonable expectation approach utilized by North Carolina courts). In Meiselman v. Meiselman, 309 N.C. 279, 307 S.E.2d 551 (1983), the North Carolina Supreme Court explained the approach, stating: "Privately held expectations which are not made known to the other participants are not `reasonable.' Only expectations embodied in understandings, express or implied, among the participants should be recognized by the court." Id. at 563 (citation omitted). Under Meiselman, a court would determine the shareholder's reasonable expectations through a case-by-case examination of the entire history of the shareholder's relationship with the corporation. Id. at 562-63.
Additionally, Professor O'Neal has called for legislation ordering courts to protect the reasonable expectations of a close corporation shareholder. See F. Hodge O'Neal, Close Corporations: Existing Legislation and Recommended Reform, 33 Bus. Law. 873, 885 (1978). But see Ralph A. Peeples, The Use and Misuse of the Business Judgement Rule in the Close Corporation, 60 Notre Dame L.Rev. 456, 505 (1985) (noting that no court has adopted the reasonable expectations test *722 without the assistance of a statute, even though the test does not require such a restriction). Professor O'Neal would place the primary emphasis on the reasonable expectations as they existed at the inception of the participants' original business bargain, but would allow fallback in some cases where all shareholders concur in changed expectations developed through subsequent dealings. See F. Hodge O'Neal & Robert B. Thompson, O'Neal's Close Corporations § 9.30, at 141 (3d ed.1992). This approach, however, ignores the expectations of the parties other than the dissatisfied shareholder. See generally Robert W. Hillman, The Dissatisfied Participant in the Solvent Business Venture: A Consideration of the Relevant Permanence of Partnerships and Close Corporations, 67 Minn. L.Rev. 1, 75-78 (1982).
While Massachusetts and New York consider business purpose in their analysis of fiduciary duties in the close corporation context, and North Carolina considers "reasonable expectations" of the dissatisfied shareholder, Delaware has adopted an entire fairness test. In Weinberger v. UOP, Inc., 457 A.2d 701, 715 (Del.1983), the Supreme Court of Delaware discarded the business purpose requirement, stating that "we do not believe that any additional meaningful protection is afforded minority shareholders by the business purpose requirement." In Weinberger, the court stated that a suit challenging a cash-out merger must allege specific acts of fraud, misrepresentation, or other forms of misconduct to demonstrate unfairness of the merger terms to the minority. Id. at 703. The court explained that the concept had two basic aspects, fair dealing and fair price. Id. at 711. Fair dealing addresses (1) when, (2) how it was initiated, (3) how it was structured, and (4) how it was disclosed whereas fair price stresses (1) economic and (2) financial considerations. Id. "All aspects of the issue must be examined as a whole since the question is one of entire fairness." Id. With respect to price, the Court held that the appraisal remedy applies but recognized that it may not be adequate in the case of fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross over-reaching. Id. at 714. The Court concluded that, given the fairness test, the availability of the appraisal remedy and the ability of a court to fashion relief from the facts of a given case, it saw no need for the business purpose rule. Id. at 715.
While Weinberger dealt with a public company, the Supreme Court of Delaware in Nixon v. Blackwell, 626 A.2d 1366, 1380 (Del.1993), in applying the fairness rule to a closely held corporation, stated that there were no special rules applicable to a closely held corporation that was not a "close corporation" within the meaning of the applicable statutes.
In our view, the fairness rule is the appropriate test under these circumstances, i.e., a reverse stock split in a closely held corporation with the effect of eliminating a minority stockholder, because it permits intervention on the facts of any given case when intervention is justified. As compared to business purpose, courts have a long history of assessing concepts of fairness. Moreover, in most cases, a plausible business purpose would not be difficult to demonstrate. See Ralph A. Peeples, The Use and Misuse of the Business Judgment Rule in the Close Corporation, 60 Notre Dame L.Rev. 456, 499 (1985)(citing F. Hodge O'Neal, O'Neal's Oppression of Minority Shareholders § 3.05 (1975)). As a result, the fairness rule, in many if not most instances, will provide courts with greater ability to fashion appropriate relief. Hanks' discussion in his treatise on Maryland Corporation law cogently addresses the appropriateness of the fairness test with respect to the freeze-out of a minority stockholder:
There is no requirement of a business purpose for a freeze-out merger for the same reasons that a business purpose is not necessary for a freeze-out by means *723 of a reverse stock split or a short-form merger. First, one of the known risks of holding a minority stock position is that there is or some day may be a holder or group of holders who control a majority of the voting power. Second, superficially plausible business purposes are not difficult to articulate and courts should not be required (and are not well equipped) to probe the validity and weight of these alleged purposes. Third, the existence of a business purpose is not necessarily connected to a more important concernthe entire fairness of the transactionthat is always present when the majority uses its voting power to eliminate (or at least alter) the minority's ownership position.
The concern for fairness arises out of a concern that in a freeze-out transaction (whether in form of a merger, short-form merger or reverse stock split), the majority will not treat the minority as favorably as it would if the assent of at least some of the minority were necessary to consummation of the transaction. In both conventional and short-form mergers, appraisal is the exclusive remedy unless the plaintiff is able to plead and prove acts or omissions resulting in unfairness to the minority. In order to pursue a non-appraisal remedy (e.g., injunction or rescission), the plaintiff must specifically plead (a) fraud, misrepresentation or other misconduct in the implementation of the transaction or (b) the reasons why the transaction is unfair to the minority. Once the plaintiff has met this pleading requirement, the defendant must prove by a preponderance of the evidence that the transaction is fair to the minority stockholders. However, if the transaction has been approved by a majority of the shares owned by the minority stockholders, then the plaintiff must prove by a preponderance of the evidence that the transaction is unfair to the minority stockholders.
So long as the process by which the transaction was accomplished and the consideration received by the minority stockholders are fair, the majority stockholder has the right to use its power to cause the corporation to engage in any legally permissible transaction.
Hanks, supra, § 7.20, 264-66 (Supp.1996) (footnotes omitted).
We note that in the circumstances before us regardless of whether we apply the test of business purpose or fairness, the evidence was sufficient to support the circuit court's findings. The evidence outlined above leads to a conclusion that there were reasons to effect the reverse stock split other than the desire, in and of itself, to oust a minority shareholder.

c. Voting Requirements
Appellees argue that the reverse stock split was valid without Lawrence's consent because it was approved by the shareholder vote required by law. Section 2-604(e) provides that an amendment to the charter shall be approved by the affirmative vote of 2/3 of all votes entitled to be cast on the matter. Appellees assert that, as part of the settlement, Lawrence could have caused the corporation to elect Maryland close corporation status or to amend its charter to require unanimity for a reverse stock split. Having failed to do so, section 2-604(e) controls and a 2/3 vote is sufficient. We do not address this issue in light of our disposition of appellant's issues.
Appellant, at trial, sought to rescind the reverse stock split, a form of equitable relief entitling the circuit court to consider principles of fairness and equity. Appellant did not seek monetary relief in the form of damages or any other monetary relief outside of the statutory appraisal process. It appears that appellant is now limited to the appraisal process.[5]
*724 JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.
NOTES
[1] The subject of reverse stock splits is discussed in the following: Paul H. Dykstra, The Reverse Stock SplitThat Other Means of Going Private, 53 Chi.-Kent L.Rev. 1 (1976); Michael J. Lawson, Comment, Reverse Stock Splits: The Fiduciary's Obligations Under State Law, 63 Cal. L.Rev. 1226 (1975); and Michael R. Rickman, Note, Reverse Stock Splits and Squeeze-outs: A Need for Heightened Scrutiny, 64 Wash. U. L.Q. 1219 (1986).
[2] Ala.Code § 10-2B-6.04 (1999); Alaska Stat. § 10.06.355 (Michie 1999); Ariz.Rev.Stat. Ann. § 10-604 (West 1999); Ark.Code Ann. § 4-27-604 (Michie 1999); Cal. Corp.Code § 407 (West 1999); Colo.Rev.Stat. § 7-106-104 (1999); Conn. Gen.Stat. Ann. § 33-668 (West 2000); Del.Code Ann. tit. 8, § 155 (1999); D.C.Code Ann. § 29-321 (1998); Fla. Stat. Ann. § 607.0604 (West 1999); Ga.Code Ann. § 14-2-604 (1999); Haw.Rev.Stat. § 415-24 (1999); Idaho Code § 30-1-604 (1999); 805 Ill. Comp. Stat. Ann. 5/6.15 (West 1999); Ind.Code Ann. § 23-1-25-4 (Michie 1999); Iowa Code Ann. § 490.604 (West 1999); Kan. Stat. Ann. § 17-6405 (1999); Ky. Rev.Stat. Ann. § 271B.6-040 (Banks-Baldwin 1998); La.Rev.Stat. Ann. § 12:51 (West 1999); Me.Rev.Stat. Ann. tit. 13-A, § 512 (West 1999); Md.Code Ann., Corps. & Ass'ns § 2-214 (1999); Mass. Gen. Laws Ann. ch. 156B, § 28 (West 1999); Mich. Comp. Laws Ann. § 450.1338 (West 1999); Minn.Stat. Ann. § 302A.423 (West 1999); Miss.Code Ann. § 79-4-6.04 (1999); Mo. Ann. Stat. § 351.300 (West 1999); Mont.Code Ann. § 35-1-621 (1999); Neb.Rev.Stat. § 21-2038 (1999); Nev.Rev.Stat. § 78.205 (1999); N.H.Rev.Stat. Ann. § 293-A:6.04 (1999); N.J. Stat. Ann. § 14A:7-13 (West 1999); N.M. Stat. Ann. § 53-11-24 (Michie 1999); N.Y. Bus. Corp. Law § 509 (McKinney 1999); N.C. Gen.Stat. § 55-6-04 (1999); N.D. Cent.Code § 10-19.1-68 (1999); Ohio Rev.Code Ann. § 1701.24 (Banks-Baldwin 2000); Okla. Stat. Ann. tit. 18, § 1036 (West 1999); Or.Rev.Stat. § 60.141 (1999); 15 Pa. Cons.Stat. Ann. § 1527 (West 1999); R.I. Gen. Laws § 7-1.1-22 (1999); S.C.Code Ann. § 33-6-104 (Law.Co-op. 1999); S.D. Codified Laws §§ 47-3-15, -16, -17 (Michie 1999); Tenn.Code Ann. § 48-16-104 (1999); Tex. Bus. Corp. Act Ann. art. 2.20 (West 1999); Utah Code § 16-10a-604 (1999); Vt. Stat. Ann. tit. 11A, § 6.04 (1999); Va.Code Ann. § 13.1-641 (Michie 1999); Wash. Rev.Code Ann. § 23B.06.040 (West 1999); W.Va.Code § 31-1-88 (1999); Wis. Stat. Ann. § 180.0604 (West 1999); Wyo. Stat. Ann. § 17-16-604 (Michie 1999).
[3] The other jurisdictions that do not designate the rights of holders of fractional shares are the District of Columbia, Nevada, and Ohio.
[4] The Maryland statute provides:

§ 2-214. Fractional share.
(a) A corporation may, but is not obliged to:
(1) issue fractional shares of stock;
(2) Eliminate a fractional interest by rounding off to a full share of stock;
(3) Arrange for the disposition of a fractional interest by the person entitled to it;
(4) pay cash for the fair value of a fractional share of stock determined as of the time when the person entitled to receive it is determined; or
(5) issue scrip or other evidence of ownership which:
(i) Entitles its holder to exchange scrip or other evidence of ownership aggregating a full share for a certificate which represents the share; and
(ii) unless otherwise provided, does not entitle its holder to exercise voting rights, receive dividends, or participate in the assets of the corporation in the event of liquidation.
(b) The board of directors may impose any reasonable condition on the issuance of the scrip or other evidence of ownership, including a condition that:
(1) it becomes void if not exchanged for a certificate representing a full share of stock before a specified date;
(2) The corporation may sell the stock for which the scrip or other evidence of ownership is exchangeable and distribute the proceeds to the holders; or
(3) The proceeds of a sale under paragraph (2) of this subsection are forfeited to the corporation if not claimed within a specified period not less than three years from the date the scrip or other evidence of ownership was originally issued.
Md. Ann.Code, Corp. & Ass'ns § 2-214 (1999).
[5] In the appraisal process, the Corporation's stock should be valued by assuming that it will continue as a going concern and, on this assumption, all relevant factors should be appraised. See Warren v. Baltimore Transit Co., 220 Md. 478, 483, 154 A.2d 796 (1959). The court has wide latitude to consider all relevant circumstances to determine a fair price. See Md. Ann.Code Corp. & Assn's § 3-211 (1999). We are aware that certain states have expanded and liberalized their appraisal remedy from the form in which it existed when first enacted. The appraisal remedy in Maryland has been addressed infrequently in appellate opinions. We are aware of no Maryland appellate case that has discussed the extent to which equitable considerations may be considered, including by way of example the conduct of parties, in determining the fair value of stock in an appraisal proceeding. Consistent with the concept of fairness, however, we see no reason why a court may not consider all factors relevant to the determination of fair value, including evidence relevant to the period of time that appellant would have remained a shareholder absent the reverse stock split.